# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Working Families Party, Christopher   :
M. Rabb, Douglas B. Buchholz, and   :
Kenneth G. Beiser,   :
         Petitioners   :
   :
     v.   :  No. 435 M.D. 2016
   :  Argued: February 8, 2017
Commonwealth of Pennsylvania,   :
Pedro A. Cortes, in his Official   :
Capacity as Secretary of the   :
Commonwealth of Pennsylvania   :
and Jonathan M. Marks, in his   :
Official Capacity as Commissioner,   :
Bureau of Commissions, Elections   :
and Legislation, Department of State,   :
Commonwealth of Pennsylvania,   :
         Respondents   :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JULIA K. HEARTHWAY, Judge[1]
           HONORABLE JOSEPH M. COSGROVE, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT         FILED: September 18, 2017

      Working Families Party, Christopher M. Rabb, Douglas B. Buchholz,

and Kenneth G. Beiser (collectively, Working Families) have filed a petition for

review in this Court's original jurisdiction[2] against the Commonwealth of

---

[1] This case was decided before Judge Hearthway's term ended on September 1, 2017.

[2] Section 761(a)(1) of the Judicial Code provides:

    (a)   General rule.-The Commonwealth Court shall have original jurisdiction of
    all civil actions or proceedings:

**(Footnote continued on the next page . . . )**

Pennsylvania; Pedro A. Cortes, Secretary of the Commonwealth of Pennsylvania; and Jonathan M. Marks, Commissioner of the Department of State's Bureau of Commissions, Elections, and Legislation (collectively, Commonwealth), challenging, as unconstitutional, several provisions of the Election Code[3] that prohibit the nomination of a single candidate for public office by two or more political organizations. Such a nomination process is called "fusion."[4] Before the Court are the parties' cross-applications for summary relief. Concluding that the anti-fusion provisions of the Election Code are constitutional under the United States and Pennsylvania Constitutions, we deny Working Families' application for summary relief and grant the Commonwealth's application for summary relief.

### Background & Procedural History

The undisputed facts of this case are as follows. In the April 26, 2016, primary election, Christopher M. Rabb was nominated by the Democratic Party as its candidate for Representative of the General Assembly's 200th Legislative District.[5] In July 2016, approximately three months after the primary election, Working Families circulated papers to nominate Rabb as its candidate in the general election for Representative of the 200th Legislative District. On July

---

**(continued . . . )**

> (1) Against the Commonwealth government, including any officer thereof, acting in his official capacity….

42 Pa. C.S. §761(a)(1).

[3] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§2600-3591.

[4] "'Fusion' as the word is used in electoral politics is a process by which two or more political [organizations] nominate one candidate for an office in an election…. [I]n states that allow fusion, a single candidate appears as a representative for two or more [political organizations] for the same office in the general election." *Stewart v. Taylor*, 104 F.3d 965, 967 (7th Cir. 1997).

[5] Rabb received 10,299 votes, constituting 47.23% of the total votes cast in the Democratic primary. Petition ¶20; Answer ¶20.

27, 2016, Working Families submitted Rabb's nomination papers with 958 signatures of registered voters in the 200th Legislative District, a Candidate Affidavit, Rabb's Statement of Financial Interests, and a check in the amount of $100 to Commissioner Marks' office at the Department of State.

Rabb altered his Candidate Affidavit by striking through the following text:

> that my name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor have I been nominated by any other nomination papers for any such office; that if I am a candidate for election at a general or municipal election I shall not be a registered and enrolled member of a political party at any time during the period of thirty (30) days prior to the primary up to and including the day of the following general or municipal election[.]

Petition ¶25; Answer ¶25; Commonwealth's Application for Summary Relief Ex. 4. Rabb further altered his Candidate Affidavit by adding the following italicized text:

> I swear (or affirm) to the above parts as required by the laws applicable to the office I seek, *having struck out certain parts based on my honest and sincere belief that they are violative of the Pennsylvania and U.S. [C]onstitutions.*

Working Families' Application for Summary Relief ¶15; Commonwealth's Application for Summary Relief ¶15.

Commissioner Marks refused to process Rabb's nomination papers for two reasons. First, Rabb had "altered the form of the statutory candidate affidavit." Second, "[Rabb's] name was already presented by nomination petitions in the General Primary, which precludes [him] from seeking the nomination of a

3

political body pursuant to 25 P.S. §2911(e)(5)."[6] Commonwealth's Application for Summary Relief Ex. 6.

On August 5, 2016, the Working Families Party, Rabb, and two voters residing in the 200th Legislative District, Douglas Buchholz and Kenneth Beiser, challenged Commissioner Marks' decision with the instant lawsuit. Working Families' petition for review included two counts. Count I requested a declaratory judgment that the anti-fusion provisions of the Election Code are unconstitutional under the United States and Pennsylvania Constitutions. Count II requested a writ of mandamus directing the Commonwealth to process Working Families' nomination papers for Rabb and to prepare a general election ballot that showed Rabb's nomination by both the Democratic Party and Working Families Party for Representative to the General Assembly for the 200th Legislative District.

---

[6] Section 951(e) of the Election Code provides:

> There shall be appended to each nomination paper offered for filing an affidavit of each candidate nominated therein, stating – (1) the election district in which he resides; (2) the name of the office for which he consents to be a candidate; (3) that he is eligible for such office; (4) that he will not knowingly violate any provisions of this act, or of any law regulating and limiting election expenses, and prohibiting corrupt practices in connection therewith; *(5) that his name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor has he been nominated by any other nomination papers filed for any such office*; (6) that in the case where he is a candidate for election at a general or municipal election, he was not a registered and enrolled member of a party thirty (30) days before the primary held prior to the general or municipal election in that same year; (7) that, in the case where he is a candidate for election at a special election, he is not a registered and enrolled member of a party; and (8) that he is not a candidate for an office which he already holds, the term of which is not set to expire in the same year as the office subject to the affidavit.

25 P.S. §2911(e) (emphasis added).

4

Concluding that there were no disputed issues of fact, on August 25, 2016, this Court directed the parties to file applications for summary relief with supporting briefs. Working Families filed its application for summary relief on September 2, 2016, and the Commonwealth filed its application on September 7, 2016. On September 13, 2016, a panel heard oral argument.

Following oral argument, this Court denied Working Families' application for summary relief on Count II and granted corresponding relief to the Commonwealth. The Court held that mandamus was not the appropriate vehicle for testing the constitutionality of a statute and, thus, dismissed Count II of the petition for review. *Working Families Party v. Commonwealth*, (Pa. Cmwlth., No. 435 M.D. 2016, filed September 30, 2016), slip. op. at 3-4.[7] Argument on the parties' applications for summary relief on Count I of the petition for review seeking declaratory relief was heard in February 2017, before this Court *en banc*.

In Count I, Working Families asks this Court to declare that the anti-fusion provisions of the Election Code violate the 14th Amendment to the United States Constitution, and Article I, Sections 5, 7, and 20 of the Pennsylvania Constitution. The Commonwealth responds that the anti-fusion provisions constitute a valid exercise of the legislature's power to regulate elections under the United States and Pennsylvania Constitutions.

### Historical Background

We begin with a review of the relevant statutory provisions and case law precedent. In the 1800s and early 1900s, fusion was a common feature of many states' electoral systems, including Pennsylvania's. *See Timmons v. Twin*

---

[7] This mooted the Commonwealth's application for summary relief based on the assertion that Count II was barred by the doctrine of laches.

*Cities Area New Party*, 520 U.S. 351, 356 (1997) ("Fusion was a regular feature of Gilded Age American politics."). In 1937, the Pennsylvania General Assembly enacted a comprehensive election statute, known as the Election Code, 25 P.S. §§2600-3591, to assure the efficiency and integrity of the electoral process. *In re Street*, 451 A.2d 427, 433 (Pa. 1982). Included therein, as an "essential element of the Legislature's plan," are several anti-fusion provisions that forbid a single candidate in a statewide race from appearing on the ballot multiple times on behalf of more than one party. *Id.* The anti-fusion provisions ended party-raiding, which is "the organized switching of blocks of voters from one party to another in order to manipulate the outcome of the other party's primary election." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983). Party-raiding results in one political faction dominating both political parties in the primaries. The Election Code's ban on fusion remains in force today.[8]

The Election Code divides political organizations into two classes: political parties and political bodies. Section 801 of the Election Code, 25 P.S. §2831.[9] The political party designation is further divided into "major political

---

[8] Notably, fusion is permitted for candidates for school board and courts of common pleas, municipal court, and magisterial district judges. *See* Section 910 of the Election Code, 25 P.S. §2870. However, Sections 951(e)(5) and 976 of the Election Code prohibit minor political parties and political bodies from nominating the same candidate in a local race. *See* 25 P.S. §§2911(e)(5), 2936. This disparate treatment was held unconstitutional in *Patriot Party of Allegheny County v. Allegheny County Department of Elections*, 95 F.3d 253 (3d Cir. 1996), and reaffirmed as unconstitutional in *Reform Party of Allegheny County v. Allegheny County Department of Elections*, 174 F.3d 305 (3d Cir. 1999).

[9] Section 801 states, in relevant part, as follows:

> (a) Any party or political body, one of *whose candidates at the general election next preceding the primary polled in each of at least ten counties of the State* not less than two per centum of the largest entire vote cast in each of said counties for any elected candidate, and polled a total vote in the State equal to *at least two per*

**(Footnote continued on the next page . . . )**

6

parties" and "minor political parties."  Section 912.2 of the Election Code, 25 P.S. §2872.2.[10]  This Court has explained the distinction between a "political body" and a "political party" as follows:

---

**(continued . . . )**

*centum of the largest entire vote cast in the State for any elected candidate, is hereby declared to be a political party within the State*, and shall nominate all its candidates for any of the offices provided for in this act, and shall elect its delegates and alternate delegates to the National convention as party rules provide. State committee members, and also such party officers, including members of the National committee, as its rules provide, shall be elected by a vote of the party electors, in accordance with the provisions of this act and party rules.

(b) *Any party* or political body, one of *whose candidates at either the general or municipal election preceding the primary polled at least five per centum of the largest entire vote cast for any elected candidate in any county, is hereby declared to be a political party within said county*; and shall nominate all its candidates for office in such county and in all political districts within said county, or of which said county forms a part, and shall elect such party officers as its rules provide shall be elected therein, by a vote of the party electors, in accordance with the provisions of this act.

(c) *Any political body which is not a political party*, as hereinabove defined, but which has nominated candidates for such general or municipal election by nomination papers in the manner provided by this act, *shall be deemed to be a political body within the meaning of this act, but such political body shall not be entitled to nominate its candidates or elect its party officers at primaries held* under the provisions of this act.

25 P.S. §2831(a), (b), (c) (emphasis added).

[10] Section 912.2 was added by the Act of February 19, 1986, P.L. 29.  It states, in relevant part, as follows:

(a) Notwithstanding any other provision in this act to the contrary, minor political parties shall nominate all of their candidates for the offices to be filled at the ensuing November election pursuant to section 903 in accordance with the requirements of section 951, other than subsection (e)(6) and (7) thereof, and section 954, and shall obtain the required signatures during the same time frame available to political bodies.  Minor political parties shall be subject to the provisions of this act applicable to political parties with respect to special elections, voter registration forms, substituted nominations and all other purposes except as otherwise expressly provided in this section.  *"Minor political party"*

**(Footnote continued on the next page . . . )**

[A] "political party" is a group that receives more than a certain number of votes at the preceding general election and is permitted to select its candidates by the primary election method after which the prospective candidate places his or her name on the primary ballot by filing a nomination petition. Any other political group is a "political body" and must select its candidates by filing nomination papers.

*In re Zulick*, 832 A.2d 572, 574 n.7 (Pa. Cmwlth. 2003) (citations omitted). In short, a political party uses the primary election to nominate its candidate; a political body nominates its candidate by collecting the requisite number of signatures from electors, of any party or no party, and filing nomination papers with the Secretary of the Commonwealth.

The anti-fusion provisions of the Election Code prohibit political parties and political bodies from nominating candidates already nominated by another political organization. Those anti-fusion provisions relevant to political bodies follow.

Section 951(e)(5) of the Election Code requires a political body candidate to file an affidavit with the Commonwealth stating

that his name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor has he been nominated by any other nomination papers filed for any such office[.]

---

**(continued . . . )**

*shall mean a political party as defined in section 801(a) or (b) whose State-wide registration is less than fifteen per centum of the combined State-wide registration for all State-wide political parties* as of the close of the registration period immediately preceding the most recent November election. The Secretary of the Commonwealth shall prescribe forms or, if there is insufficient time, make appropriate conforming changes in existing forms to carry out the purposes of this section.

25 P.S. §2872.2(a) (emphasis added).

25 P.S. §2911(e)(5).  Likewise, the Secretary of the Commonwealth is required to reject nomination papers

> if the candidate named therein has filed a nomination petition for any public office for the ensuing primary, or has been nominated for any such office by nomination papers previously filed[.]

Section 976 of the Election Code, 25 P.S. §2936 (applicable to both political bodies and political parties).  Finally, the Election Code prohibits a political body from filing a substitute nomination certificate for a candidate already nominated by another political party.  Section 980 of the Election Code states:

> no substitute nomination certificate shall nominate any person who was a candidate for nomination by any political party for any office to be filled at the ensuing November election, whether or not nominated for such office by such political party, or who has already been nominated by any other political body for any office to be filled at the ensuing November or special election.

25 P.S. §2940.  Significantly, the Election Code has identical provisions prohibiting political parties from engaging in fusion.  *See* Sections 910[11] and 979[12] of the Election Code, 25 P.S. §§2870, 2939.

Working Families concedes that the Election Code prohibits fusion of candidates in statewide races and makes no exception for major political parties.

---

[11] Section 910 requires that a political party candidate file an affidavit with the Commonwealth stating "that he is not a candidate for nomination for the same office of any party other than the one designated in such petition."  25 P.S. §2870.

[12] Section 979 prohibits political parties, in the event of a vacancy, from nominating a candidate who has already been nominated by a political party or political body for the same office.  It states: "no substitute nomination certificate shall nominate any person who has already been nominated by any political party or by any other political body for the same office."  25 P.S. §2939.

9

However, Working Families maintains that the so-called "*Magazzu* Loophole," named after our Supreme Court's decision in *Appeal of Magazzu*, 49 A.2d 411 (Pa. 1946), allows major political parties to fuse their candidates in statewide races, such as those for General Assembly and United States Congress, but denies political bodies this opportunity.

### *Appeal of Magazzu*

In the primary election of 1946, Pietro A. Magazzu was a Republican candidate for the office of representative in the General Assembly. He was defeated by another Republican candidate. The Democratic ticket contained one candidate, Milo B. Serfas, and Magazzu defeated Serfas by write-in votes. The county board of elections refused to certify Magazzu as the nominee of the Democratic Party; instead, it certified Serfas. The issue presented to our Supreme Court was whether "a candidate who had filed nominating petitions as a member of one party [was] ineligible to receive the nomination of another party for the same office by 'write-in' or legal ballots or votes[.]" *Magazzu*, 49 A.2d at 411.

The Supreme Court recognized that the Election Code forbids a candidate from being nominated by more than one political party. However, the Court clarified that:

> [n]owhere in the act, or its amendments, is there a prohibition against a voter writing in or pasting in the name of a person for whom he desires to vote if such name is not printed on the ballot of the political party of which the voter is a member.

*Id.* at 412. The Court also noted that the opportunity for write-in votes on a paper ballot is guaranteed by Section 1002(b) of the Election Code, which states:

> There shall be left at the end of the list of candidates … as many blank spaces as there are persons to be voted for, for such office, in which space the elector may insert the name of any

10

person whose name is not printed on the ballot as a candidate for such office.

25 P.S. §2962(b). Similarly, Section 1216(e) provides a mechanism for write-in votes where voting is done by machine:

[a] voter may, at any primary or election, vote for any person for any office, for which office his name does not appear upon the voting machine as a candidate, by an irregular ballot containing the name of such person deposited, written or affixed in or upon the appropriate receptacle or device provided in or on the machine for that purpose, and in no other manner.

25 P.S. §3056(e).[13] The Supreme Court held that Magazzu belonged on the general election ballot as the Democratic Party candidate for state representative.

In *Magazzu*, one candidate by that name appeared on the general election ballot with a single party designation. Working Families notes that a candidate can win a major party's nomination in the primary and *also* win another party's nomination by means of write-in votes. In that case, the candidate will appear on the general election ballot as nominated by both major political parties. Working Families asserts that this happens with some regularity.[14]

---

[13] Serfas' argument that the Election Code prohibited Magazzu from being certified as the Democratic Party's candidate was based on the use of machine ballots. A voting machine displays the names of candidates for each party and is locked so that the voter may only vote for a candidate listed for the voter's party. Serfas maintained that because Magazzu was identified as a Republican candidate on the voting machine, he was ineligible from receiving write-in votes as the Democratic candidate. Serfas conceded that this objection would not apply to a paper ballot, which lists only the candidates nominated by a voter's political party. The Court rejected this argument, stating that it could "ascribe no intent to the legislature to differentiate in that respect between a paper and a machine ballot." *Magazzu*, 49 A.2d at 412.

[14] Working Families compiled a list of elected state representatives with both Democratic and Republican designations. *See* Working Families' Application for Summary Relief, Exhibit G. The list identified members of the General Assembly, both Senators and Representatives, who were designated Democratic/Republican in seven different election cycles from 2002 to 2014. **(Footnote continued on the next page . . . )**

11

The Commonwealth responds that Working Families overstates the significance of our Supreme Court's holding in *Magazzu*. It contends that *Magazzu* simply established that the Election Code allows a voter to write in "the name of a person for whom he desires to vote if such name is not printed on the ballot of the political party of which the voter is a member" and to expect that vote to be counted. *Magazzu*, 49 A.2d at 412. *Magazzu* did not create a "loophole" from the anti-fusion provisions of the Election Code. In any case, the *Magazzu* holding applies equally to major political parties, minor political parties, and political bodies. We agree.

The holding in *Magazzu* does not authorize the two major parties to nominate a single candidate for statewide office. Rather, *Magazzu* stands for the simple proposition that in a primary election, a voter may write in the name of any person "not printed on the ballot of the political party" to which the voter belongs. *Id*. The write-in vote allows citizens to choose a candidate who does not have the support of the party establishment. A major party candidate can win his party's primary election and also win the other party's primary with write-in votes. In that case, the individual will appear on the ballot as the candidate for the two major parties in the general election. However, a political body candidate who has filed the requisite nomination papers prior to the primary election can also win the

---

**(continued . . . )**
Some of those listed involved the same representative in succeeding election cycles. According to Working Families' exhibit, the Democratic/Republican designations occurred 100 times in these seven election cycles. The General Assembly has 253 members. There are 50 Senators and 203 Representatives. Representatives are elected every two years, and Senators are elected every four years.

write-in vote for a major party in the primary and, thus, appear on the general election ballot as the candidate of a major party and of a political body.

The anti-fusion provisions of the Election Code forbid the nomination of one candidate by more than one political organization for the same office. However, these provisions have nothing to do with the ability of voters to nominate a candidate by write-in vote. The potential for fusion by a successful write-in campaign is not limited to major party candidates. The same may be accomplished by a political body. We reject Working Families' contention that *Magazzu* permits what the anti-fusion provisions of the Election Code prohibit.

### Alleged Constitutional Violations

With this background, we turn to the constitutional challenge Working Families has lodged against Sections 634, 910, 951, 976, 979, 980 and 1406 of the Election Code, 25 P.S. §§2784, 2870, 2911, 2936, 2939, 2940, and 3156. These provisions, in various ways and at various steps in the electoral process, prohibit two or more political organizations from nominating a single candidate. The proscription applies both to political parties, major and minor, and to political bodies.

### I.

Working Families first contends that the anti-fusion provisions of the Election Code violate the equal protection clause of the Fourteenth Amendment to the United States Constitution.[15] More specifically, Working Families argues that

---

[15] The Fourteenth Amendment provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person

**(Footnote continued on the next page . . . )**

the anti-fusion provisions have a disparate impact on political bodies. Working Families concedes that it can use write-in votes to have its candidate also appear on the ballot as the candidate of a major party. However, it argues that the write-in path to fusion is far more difficult for political bodies than for major parties.

For a major party to fuse its candidate with another party, a candidate submits a nomination petition with the requisite number of signatures to appear on the primary ballot.[16] Simultaneously, the party or candidate, or both, must launch a write-in campaign for the other major party's nomination in the primary. If the primary election results in the candidate winning the nomination of both parties, he will appear on the general election ballot as a candidate for both parties.

For a political body to fuse, the task is different.[17] The political body's preferred candidate cannot file a nomination petition as a major party candidate and appear on the primary election ballot. The political body nominates its candidate by filing nomination papers with the Secretary of the Commonwealth on or before August 1st. If the political body wants to have its preferred candidate also appear on the general election ballot as a major party candidate, it must wage a write-in campaign. To do this, it will have to file its nomination papers before

_____

**(continued . . . )**
> of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*

U.S. CONST. amend. XIV, §1 (emphasis added).

[16] The number of signatures required for nomination petitions of candidates for the primary election varies based on the office sought. *See* Section 912.1 of the Election Code, added by the Act of December 12, 1984, P.L. 968, *as amended*, 25 P.S. §2872.1.

[17] Working Families submits that since 2002, no political body or minor party candidates have successfully fused with a major party.

the primary election takes place.[18]  Working Families' Brief in Support of Summary Relief at 26.  Notably, to sign a political body's nomination papers, the elector needs to be a registered voter, but he need not be a member of the political body.[19]  Working Families contends that its path to fusion is more difficult and, thus, the fusion ban violates equal protection.[20]

---

[18] The signature requirement for statewide offices is found in Section 951(b) of the Election Code, 25 P.S. §2911(b).  It requires a political body's nomination paper to include valid signatures equal to two percent of the vote total of the candidate with the largest number of votes for any statewide office in the previous election.  *Id.*

The dissent observes that political bodies must collect a "high number" of signatures to meet the dictates of Section 951(b).  We note, first, that Working Families does not challenge the signature requirement for political bodies.  To nominate a candidate for representative to the General Assembly in the 2016 election, Working Families was required to obtain a minimum of 495 signatures.  Working Families obtained 958.  For Working Familites, compliance with Section 951(b) was not onerous.

We acknowledge, however, that Section 951(b) has been called into question with respect to the signature requirements for statewide elections.  Recently, three Pennsylvania political bodies, the Constitution Party, Green Party, and Libertarian Party, launched a successful challenge to Section 951(b).  They sought a temporary restraining order and preliminary injunction to be excused from complying with the signature requirement formula in Section 951(b). On June 30, 2016, the District Court for the Eastern District of Pennsylvania granted the motion and ordered the Secretary of the Commonwealth to accept the political bodies' nomination papers containing far fewer signatures than would have otherwise been required under Section 951(b).  *Constitution Party of Pennsylvania v. Cortés* (E.D. Pa., No. 12-2726, order filed June 30, 2016).  The district court's order is "intended to replace the signature requirement" imposed by Section 951(b), and sets forth a new, static signature requirement for certain offices.  *Id.* (requiring, for example, a candidate for Attorney General to obtain 2,500 signatures including 250 from each of at least 5 counties).  Notably, the district court's order does not create a new signature requirement for the office of state representative to the General Assembly, but requires candidates for all such "non-statewide offices" to comply with Section 951(b).  *Id.* at 2, ¶2.

[19] By contrast, only members of the major political party can sign a nomination petition to place a candidate on the primary election ballot.

[20] The dissent notes that a major party, unlike a minor party or political body, may nominate "by write in someone who has submitted a nomination petition for the other [major] party's primary."  Dissenting op. at n.3.  This difference is a function of the fact that only major parties

**(Footnote continued on the next page . . . )**

Working Families' argument presupposes that a grass roots movement cannot successfully take on the candidate chosen by a major party's establishment, which commands the party's coffers and staff. Surely, the presidential race of 2016 undermines this assumption. One anti-establishment candidate was no doubt assisted by his personal fortune and a successful reality television show. However, the socialist candidate, lacking both attributes, almost defeated the other major party's establishment candidate.

Fusion by write-in vote is different for a political body than for a major party because the Election Code sets up a different nomination procedure for each political organization. That a political body finds it difficult to have its candidate win a major party primary by write-in vote may be explained by the lack of an appealing candidate with an inspiring message. Acknowledging the political body's different path to fusion by a write-in campaign, we address Working Families' equal protection claim.

The Pennsylvania Supreme Court has summarized the basic principles of equal protection as follows:

> The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications provided that those classifications are reasonable rather than arbitrary and bear a relationship to the object of the legislation.

*Kramer v. Workers' Compensation Appeal Board (Rite Aid Corp.)*, 883 A.2d 518, 532 (Pa. 2005) (quoting *Curtis v. Kline*, 666 A.2d 265, 267-68 (Pa. 1995))

---

**(continued . . . )**
file nomination petitions to place candidates on the primary election ballot. Any person, including a political body's candidate, can win a major party primary by write-in vote.

16

(emphasis added).[21]  In short, legislative classifications, per se, do not offend equal protection.

The level of scrutiny to be applied to a legislative classification depends upon the interest affected by the classification.  Our Supreme Court has identified three levels of scrutiny:

> The types of classifications are: (1) classifications which implicate a "suspect" class or a fundamental right; (2) classifications implicating an "important" though not fundamental right or a "sensitive" classification; and (3) classifications which involve none of these.  *Id.*  Should the statutory classification in question fall into the first category, the statute is strictly construed in light of a "compelling" governmental purpose; if the classification falls into the second category, a heightened standard of scrutiny is applied to an "important" governmental purpose; and if the statutory scheme falls into the third category, the statute is upheld if there is any rational basis for the classification.

*Curtis*, 666 A.2d at 268 (quoting *Smith v. City of Philadelphia*, 516 A.2d 306, 311 (Pa. 1986)).

Working Families asserts that the anti-fusion sections of the Election Code, in conjunction with the *Magazzu* holding, create a classification that treats political parties and political bodies differently with respect to their ability to fuse candidates.  Working Families further argues that this classification affects the

---

[21] In *Kramer*, the Court addressed equal protection claims under both the United States and Pennsylvania Constitutions.  It recognized that "[i]n evaluating equal protection claims under the Pennsylvania Constitution, this Court has employed the same standards applicable to federal equal protection claims."  *Kramer*, 883 A.2d at 532.  Accordingly, the analysis set forth in *Kramer* is applicable here, where Working Families brings its claim under the Fourteenth Amendment of the United States Constitution.

17

fundamental right to vote, and thus, is subject to strict scrutiny review.[22] We disagree.

First and foremost, the anti-fusion provisions of the Election Code do not create a classification. They are facially neutral; they prohibit both political parties and political bodies from fusing their candidate with another political organization's candidate. This conclusion was reached by our Supreme Court in *In re Street*, 451 A.2d 427 (Pa. 1982).

T. Milton Street filed nomination papers to appear on the general election ballot as candidate of the Milton Street Party, a political body, for the office of Representative of the Second District of Pennsylvania to the United States Congress. After Street's nomination papers were filed and accepted by the Secretary of State, the Republican Party's candidate withdrew from the election. The Republican Party then filed a substitute nomination certificate naming Street as its substitute nominee. The Democratic Party challenged the Republican Party's

---

[22] Every law regulating election processes imposes some kind of burden upon a voter. Only where a law imposes a severe burden on the right to vote is it subject to strict scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

Working Families tries to make its equal protection claim a voting rights case by arguing that the anti-fusion provision "forces [voters] to make a Hobson's choice between efficacy and fidelity to their own values." Working Families' Brief in Support of Application for Summary Relief at 44. It contends that being presented with the choice to "vote party" or "vote candidate" burdens the voting rights of its members.

The United States Supreme Court rejected the "Hobson's choice" argument in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 360 (1997). In *Timmons*, the Court of Appeals held that Minnesota's fusion ban forced members of the New Party to make a "no-win choice" between voting for a candidate with no realistic chance of winning or "defecting" to vote for a major party candidate. *Id.* In overruling the Court of Appeals, the Supreme Court held that the New Party "remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen." *Id.* at 361. Indeed, every voter in every general election has to make hard choices, regardless of whether they are a member of a major party, a minor party or a political body.

substitute nomination certificate under Section 979 of the Election Code. The Commonwealth Court granted the Democratic Party's requested relief to set aside the substitute nomination certificate.

Before the Supreme Court, Street conceded that his substitute nomination by the Republican Party violated Section 979 of the Election Code, which states that "no substitute nomination certificate shall nominate any person who has already been nominated by any political party or by any other political body for the same office…." 25 P.S. §2939. Street raised several constitutional challenges to Section 979 of the Election Code, including equal protection.

Street argued that Section 979 violated equal protection of law because it treated political bodies and political parties alike even though they are different. Street conceded that the anti-fusion provisions of the Election Code promoted the legitimate state interest of preventing party-raiding. However, the prohibition against a party's substitute nomination of a candidate who has already been nominated by a *political body* failed to further this, or any other legitimate state interest.

The Supreme Court disagreed. It rejected Street's theory that political bodies must be treated differently than political parties, noting, instead, that it was the differentiation proposed by Street that posed an equal protection issue. The Supreme Court held that facially discriminatory anti-fusion laws do not violate equal protection, explaining:

> Under Pennsylvania's Election Code…political parties and political bodies are treated equally: neither may nominate, either initially or through substitution, a candidate for the general election who has already been nominated by another political group.

19

*In re Street*, 451 A.2d at 431. Because anti-fusion provisions of the Election Code were facially neutral, Street did not meet the threshold burden of demonstrating a legislative classification. Section 979 of the Election Code was at issue in *In re Street*, but the Supreme Court's analysis applies with equal force to the other anti-fusion provisions in the Election Code challenged here by Working Families.

Nor does *Magazzu* treat political parties and political bodies differently. As Working Families concedes, fusion is available to *a political party and a political body* so long as it is accomplished by write-in votes. To the extent a successful write-in campaign in the primary is harder for a political body candidate to achieve, this is a fortuity arising from factual circumstances, such as finances and organization, external to the statute.

Even assuming, *arguendo*, that Working Families has identified a disparate impact on political bodies, we reject its contention that this creates a classification that requires a strict scrutiny review. The right to vote is not impacted by anti-fusion provisions of the Election Code. Citizens of the Commonwealth are free to cast their vote for their candidate of choice, by write-in or otherwise. To the extent *Magazzu* implicates the right to vote, it protects the right by assuring that write-in votes will be counted.

*In re Street*, 451 A.2d 427, is dispositive of Working Families' equal protection claim. In arguing otherwise, Working Families points to *Reform Party of Allegheny County v. Allegheny County Department of Elections*, 174 F.3d 305 (3d Cir. 1999), which considered the provisions of the Pennsylvania Election Code that allowed major parties to fuse candidates for certain local races but expressly prohibited minor parties from doing so. *See* Sections 951(e)(5) and 976 of the

20

Election Code, 25 P.S. §§2911(e)(5), 2936. The Court of Appeals held that the prohibition of fusion in local races by political bodies and minor parties violated equal protection and was unconstitutional. Because *Reform Party* considered facially discriminatory statutory provisions in the Election Code, it is inapposite.

Even so, the Court of Appeals did not apply a strict scrutiny standard of review for deciding the equal protection challenge. Rather, it applied an intermediate level of scrutiny, which weighed the burden imposed against "any plausible justification the State has advanced for imposing unequal burdens on major and minor parties." *Reform Party*, 174 F.3d at 315. As set forth below, the Commonwealth has offered a justification for the burden that passes the intermediate standard of review applied in *Reform Party*.

Working Families' equal protection argument is not based upon the language of the Election Code but, rather, upon the premise that *Magazzu* has excused political parties from the anti-fusion dictates of the Election Code. This is not a correct understanding of *Magazzu*, which allows a candidate to win a primary election by write-in votes even though he appeared on the primary ballot for another political party. In *In re Street*, 451 A.2d 427, our Supreme Court rejected an equal protection challenge to the anti-fusion provisions of the Election Code, and it did so more than 30 years after its holding in *Magazzu*. *Magazzu* does not require a re-examination of the holding reached in *In re Street*.

## II.

Working Families next argues that the anti-fusion provisions of the Election Code violate Article I, Sections 5, 7, and 20 of the Pennsylvania Constitution. These provisions provide for free and equal elections, freedom of speech, and freedom of association. We consider these claims *ad seriatim*.

21

## Speech and Association

The Pennsylvania Constitution guarantees every citizen freedom of speech and freedom to associate with others. Article I, Section 7 of the Pennsylvania Constitution provides, in relevant part:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

PA. CONST. art. I, §7. Article I, Section 20 guarantees the right to associate. It reads:

> The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance.

PA. CONST. art. I, §20.

Freedom of speech and association undeniably constitute fundamental rights.[23] *In re Nader*, 905 A.2d 450, 465 (Pa. 2006). Nevertheless, our Supreme Court has recognized that in the context of election law, "not all restrictions imposed by [] States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or choose among candidates." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). The Commonwealth may, and inevitably must, "enact substantial regulation containing reasonable, non-discriminatory restrictions to ensure honest and fair elections that

---

[23] Working Families does not separate its speech rights and associational rights claims. They are one and the same in the context of a ballot access claim.

proceed in an orderly and efficient manner." *Banfield v. Cortés*, 110 A.3d 155, 176-77 (Pa. 2015).

In deciding whether the Election Code's anti-fusion provisions violate speech and associational rights guaranteed by the Pennsylvania Constitution, we weigh the character and magnitude of the burden imposed by the provisions against the interests proffered to justify that burden. *Timmons*, 520 U.S. at 358. The Pennsylvania Constitution affords greater protection of speech and associational rights than does our Federal Constitution. *See DePaul v. Commonwealth*, 969 A.2d 536, 546 (Pa. 2009) (noting, *inter alia*, that Article I, Section 7 is the "ancestor, not a stepchild, of the First Amendment"). Nevertheless, our Supreme Court has explained that reference to "First Amendment authority remains instructive in construing Article I, Section 7" of the Pennsylvania Constitution. *Id.* at 547.

Working Families argues that prohibiting a political body from fusing its candidate with a major party candidate denies the political body freedom of expression and association.[24] It is barred from choosing the most attractive candidate willing to accept its nomination. Working Families further argues that the fusion ban violates the speech and associational rights of candidates and of voters. It contends that the Election Code's burden on speech and association requires a strict scrutiny review.

Our Supreme Court has ruled that the fusion ban in the Election Code does not violate the First Amendment. It explained as follows:

---

[24] Nothing in the Election Code prevents a major party candidate from associating with a political body and expressing support for the political body's values and platform. In a general election, a candidate reaches out to all voters, not just those in the party that nominated him. To this end, candidates seek endorsements from a wide spectrum of individuals and interest groups.

> While the right to associate for the advancement of political beliefs includes the right to advance a candidate who represents those interests, *the "ballot access" cases of the United States Supreme Court make it clear that the right of association does not encompass the right to nominate as a candidate a particular individual who fails to meet reasonable eligibility requirements....* Where, as here, the challenged requirement simply prohibits the nomination of a candidate who is already on the ballot, it cannot reasonably be said that this requirement "unfairly or unnecessarily burden[s] either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity."

*In re Street*, 451 A.2d at 432 (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974) (emphasis added)). Here, the most recent "ballot access" case is *Timmons*, 520 U.S. 351, which was decided a generation after *In re Street*.

In *Timmons*, the New Party, a minor political party as defined in Minnesota election law, sought to nominate Andy Dawkins as its candidate for Minnesota State Representative. Dawkins had previously filed as a candidate for State Representative of the Minnesota Democratic-Farmer-Labor Party, a major political party, and was running unopposed. Neither Dawkins nor the Democratic-Farmer-Labor Party objected to the New Party's nomination of Dawkins, and he filed the required candidate affidavit with election officials.

Minnesota's election law prohibited fusion candidacies. Because Dawkins had already filed a petition to be a candidate for the Democratic-Farmer-Labor Party's nomination, local election officials refused to accept the New Party's nomination petition naming Dawkins. As a result, the New Party filed suit contending that Minnesota's election laws prevented it from selecting and associating with its candidate of choice. In rejecting the New Party's claim, the Supreme Court explained:

24

> The New Party's claim that it has a right to select its own candidate is uncontroversial, so far as it goes.... That is, the New Party, and not someone else, has the right to select the New Party's "standard bearer." *It does not follow, though, that a party is absolutely entitled to have its nominee appear on the ballot as that party's candidate....* That a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights.

*Timmons*, 520 U.S. at 359 (internal citations omitted) (emphasis added). The Court further observed that the anti-fusion sections of Minnesota's election law merely "reduce[d] the universe of potential candidates who may appear on the ballot as the party's nominee...." *Id.* at 363.

The United States Supreme Court rejected the argument that anti-fusion laws severely burden the First Amendment guarantee of speech and association because the primary purpose of a ballot is to elect candidates, not to serve as a forum of political expression. The Supreme Court reasoned as follows:

> It is true that Minnesota's fusion ban prevents the New Party from using the ballot to communicate to the public that it supports a particular candidate who is already another party's candidate. In addition, the ban shuts off one possible avenue a party might use to send a message to its preferred candidate because, with fusion, a candidate who wins an election on the basis of two parties' votes will likely know more—if the parties' votes are counted separately—about the particular wishes and ideals of his constituency. *We are unpersuaded, however, by the party's contention that it has a right to use the ballot itself to send a particularized message*, to its candidate and to the voters, about the nature of its support for the candidate. *Ballots serve primarily to elect candidates, not as forums for political expression....* Like all parties in Minnesota, the New Party is able to use the ballot to communicate information about itself and its candidate to the voters, so long as that candidate is not already someone else's candidate. The party retains great latitude in its ability to communicate ideas to voters and candidates through its participation in the campaign, and party members may campaign for, endorse, and vote for

25

> their preferred candidate even if he is listed on the ballot as another party's candidate....

*Id.* at 362-63 (internal citations omitted) (emphasis added).

Pennsylvania's Constitution provides greater protection of speech and associational rights than does its federal counterpart, but we are guided by the teachings of the United States Supreme Court on these rights. *DePaul*, 969 A.2d at 547. Further, where a party to litigation "mounts an individual rights challenge under the Pennsylvania Constitution, the party should undertake an independent analysis" to explain why "state constitutional doctrine should depart from the applicable federal standard." *Id.* at 541.[25] Working Families has not offered this explanation. Accordingly, we employ the analytical paradigm established in *Timmons*, 520 U.S. 351, with respect to Article I, Sections 7 and 20 of the Pennsylvania Constitution.

In *Timmons*, the Supreme Court held that the "character and magnitude of the burden" on the right of speech and association must be weighed against the state's justification for the burden. The Supreme Court explained that:

> [r]egulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's "'important regulatory interests'" will usually be enough to justify "'reasonable, nondiscriminatory restrictions.'"

---

[25] In *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), our Supreme Court held that when advocating a departure from the analogous federal standard in interpreting a state constitutional provision, the party should brief (1) the text of the Pennsylvania Constitution, (2) its history and Pennsylvania case law thereon, (3) case law from other jurisdictions and (4) policy considerations, including unique issues of state and local concern. Working Families has not done the *Edmunds* analysis.

*Timmons*, 520 U.S. at 358 (citations and quotations omitted). *Timmons* held that the anti-fusion provisions limit the "universe of potential candidates" that may appear as a party's candidate. *Id*. at 352. Under *Timmons*, this was held to require the "less exacting review," *i.e.*, whether the Commonwealth's asserted interests justify the burden imposed. *Id.* at 358.

The Commonwealth has proffered an "important regulatory interest" to justify the Election Code's prohibition of fusion. The Election Code designates a political organization as either a political party or a political body based on its performance in the preceding general election. Based on a percentage-vote calculation set forth in Section 801 of the Election Code, 25 P.S. §2831,[26] a political organization whose candidate receives two percent of the total votes cast for any candidate who is elected, both statewide and in each of at least ten counties, is designated a statewide political party. A political organization whose candidate receives five percent of the total votes cast in a given county, at either the preceding general or municipal election, may attain county political party status.[27] A political organization that has a vote performance below two percent at the state level, or five percent at the county level, is designated as a political body.

If fusion were permitted, Rabb's name, for example, would have appeared on the general election ballot with the designation "Democratic Party/Working Families Party." His name would not appear twice, *i.e.*, once as a

---

[26] *See supra* n.8.

[27] There is a further division between major political parties and minor political parties. *See* Section 912.2 of the Election Code, 25 P.S. §2872.2. Minor political parties are parties whose statewide registration is less than fifteen percent of the combined statewide registration for all statewide political parties. *Id.* Major political parties are those with greater than fifteen percent registration.

candidate of the Democratic Party and again as a candidate of the Working Families Party. The Election Code provides no procedure to disaggregate or apportion the total votes received by a candidate. Accordingly, it would be impossible to determine whether the support for the candidate came from the votes of the political party or from the political body.

Because Pennsylvania aggregates its vote totals, fusion would make it impossible to perform the percentage-based vote calculation to determine proper designations of political organizations in the next election cycle.[28] This vote-based calculation is important because only political parties must nominate their candidates in primary elections. Section 902 of the Election Code, 25 P.S. §2862. Without the anti-fusion provisions, third party candidates could be eliminated from the general election ballot.

Political bodies may begin to circulate nomination papers on the tenth Wednesday prior to the primary and must file them on or before the second Friday following the primary election, *i.e.*, August 1st. *See* Section 953(b), (c) of the Election Code, 25 P.S. §2913(b), (c).[29] If fusion were permitted, members of a

---

[28] Working Families responds that the disaggregation issue could be avoided by dividing the total number of votes by the number of nominating bodies, or, by assigning one hundred percent of the votes to the non-major-party organization. *See Youngman v. Lycoming County Board of Elections*, 47 Pa. D. & C. 2d 367 (1969). Because we hold the anti-fusion provisions pass constitutional muster, we decline to consider these alternative vote allocation methods.

[29] It states, in relevant part, as follows:

> (b) No nomination paper shall be circulated prior to the tenth Wednesday prior to the primary, and no signature shall be counted unless it bears a date affixed not earlier than the tenth Wednesday prior to the primary nor later than the second Friday subsequent to the primary.

> (c) All nomination papers must be filed on or before the second Friday subsequent to the primary.

25 P.S. §2913(b), (c).

28

major political party could, during and after the primary election, circulate nomination papers to name the major party's nominated candidate as the nominee of a political body without the consent of any members of the political body. The superior organization of a major party would enable it to collect the requisite signatures and submit nomination papers to the Secretary of the Commonwealth faster than the real political body could accomplish those tasks. Commonwealth's Application for Summary Relief, Marks Declaration ¶33 ("[political bodies] have typically waited until shortly before the deadline to submit their nomination papers[.]"). The Secretary must accept the first valid set of nomination papers bearing the name of a political body, and reject any filed later. By winning the race to file, a major party could "impersonate" a political body. This would have the undesirable result of fewer candidates being presented to the electorate in the general election.

The General Assembly has made the determination that stability in the election process is not served by fusion of candidates. Our Supreme Court has stated:

> The real purpose of this part of the so-called "party raiding" provisions is to prevent the election ballot from being cluttered by candidates who are seeking to multiply the number of times their name appears on the ballot under various inviting labels.

*Packrall v. Quail*, 192 A.2d 704, 706 (Pa. 1963). As observed by our Supreme Court, the constitutionality of anti-fusion "has been consistently sustained by this Court since the enactment of the Election Code in 1937." *In re Street*, 451 A.2d at 433. We hold that the anti-fusion provisions of the Election Code do not violate the rights of speech and association protected by Article I, Sections 7 and 20 of the Pennsylvania Constitution.

29

**Free and Equal Elections**

In its final argument, Working Families asserts the ban on fusion violates the free and equal election clause of the Pennsylvania Constitution. Article I, Section 5 of the Pennsylvania Constitution, which guarantees free and equal elections, provides:

> Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

PA. CONST. art. I, §5. Elaborating on the meaning of the "free and equal election clause," our Supreme Court has directed that:

> [E]lections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself[;] and when no constitutional right of the qualified elector is subverted or denied him.

*Shankey v. Staisey*, 257 A.2d 897, 899 (Pa. 1969) (quoting *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914)).

Our Supreme Court has recognized that Article I Section 5 implicates a citizen's right to vote, which is "fundamental and 'pervasive of other basic civil and political rights.'" *Banfield*, 110 A.3d at 176 (quoting *Bergdoll v. Kane*, 731 A.2d 1261, 1269 (Pa. 1999)). Nevertheless, the Commonwealth "may enact substantial regulation containing reasonable, non-discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner." *Id.* at 176-77.

30

Working Families argues the anti-fusion provisions of the Election Code deny voters the right to have their vote counted in a way that reflects their true party preference. Working Families asserts that it is imperative that representatives know the values of those who vote for them, and cross-nomination enables some record of this by permitting members of political bodies to "vote their values without wasting their votes." Working Families' Brief in Support of Application for Summary Relief at 24. It is beyond peradventure that each citizen has a right to cast his vote and have it counted. However, as explained previously, the Pennsylvania Constitution does not guarantee that a voter will approve of his party's chosen candidate; a voter may be presented with the choice to "vote party" or "vote candidate."

In the 2016 general election, Working Families' members had the unfettered ability to vote for Rabb, their preferred candidate. That Rabb's name appeared on the general election ballot as the Democratic Party candidate, but not also as the Working Families candidate, did not impose a burden. Members of Working Families were free to cast their vote for Rabb.

To the extent Working Families claims that its members' voting rights were infringed upon because they cannot send a message about their preferred candidate through the ballot, we have addressed this contention. Simply, "[b]allots serve primarily to elect candidates, not as forums for political expression." *Timmons*, 520 U.S. at 363.

Working Families argues that under *Magazzu*, supporters of political bodies cannot vote for fused candidates whereas supporters of major party candidates can. However, as addressed above, this is the result of circumstances external to the Election Code. *Magazzu* established simply that number of votes,

31

even when cast by write-in, determines the winner of a primary election. A candidate's appearance on the ballot with multiple political designations does not affect voting rights. A voter supporting such a candidate is not in a position superior to the voter casting his ballot for a candidate having a single political designation. In each scenario, the vote is counted once.

In its final argument, Working Families maintains the anti-fusion provisions are a product of the major political parties' effort to prevent the free exercise of the right of suffrage. Specifically, it asserts "the legislature acted to advance the interests of the two established major parties, and to block outsiders." Working Families' Brief in Support of Application for Summary Relief at 28. It offers no support of this claim. In any case, the "motive" of an individual legislator voting on legislation is irrelevant to the constitutionality of a collective work product. *See McCormick v. Columbus Conveyer Company*, 564 A.2d 907, 910 n.1 (Pa. 1989) (holding that remarks and understandings of individual legislators is not relevant to the meaning of the statute). As noted above, the anti-fusion provisions serve an important regulatory function: they prevent party raiding and "avoid voter confusion." *In re Street*, 451 A.2d at 430. We decline to address further Working Families' bald assertions of legislative conspiracy.

In sum, Working Families has failed to present a viable claim that the anti-fusion provisions of the Election Code impose any burden on the right to vote or otherwise offend Article I, Section 5 of the Pennsylvania Constitution.

## Conclusion

Working Families has failed to establish that the anti-fusion provisions of the Election Code are unconstitutional under the United States or Pennsylvania Constitutions. *Magazzu* did not create a major party exemption from

32

the Election Code's across-the-board ban on any political organization nominating a candidate of another political organization. The Election Code's anti-fusion provisions, which are facially neutral, violate neither the equal protection clause of the 14th Amendment of the United States Constitution nor the rights of free and equal elections and freedom of speech and association guaranteed by Article I of the Pennsylvania Constitution.

Accordingly, we deny Working Families' application for summary relief and grant the Commonwealth's application for summary relief.

_____
MARY HANNAH LEAVITT, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Working Families Party, Christopher | : | |
| M. Rabb, Douglas B. Buchholz, and | : | |
| Kenneth G. Beiser, | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 435 M.D. 2016 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Pedro A. Cortes, in his Official | : | |
| Capacity as Secretary of the | : | |
| Commonwealth of Pennsylvania | : | |
| and Jonathan M. Marks, in his | : | |
| Official Capacity as Commissioner, | : | |
| Bureau of Commissions, Elections | : | |
| and Legislation, Department of State, | : | |
| Commonwealth of Pennsylvania, | : | |
| Respondents | : | |

# **O R D E R**

AND NOW, this 18th day of September, 2017, petitioners' application for summary relief is denied and respondents' cross-application for summary relief is granted as to Count I of the petition for review.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Working Families Party,                          :
Christopher M. Rabb, Douglas B.                  :
Buchholz, and Kenneth G. Beiser,                 :
                         Petitioners             :
                                                 :
              v.                                 :
                                                 :
Commonwealth of Pennsylvania,                    :
Pedro A. Cortes, in his Official                 :
Capacity as Secretary of the                     :
Commonwealth of Pennsylvania,                    :
and Jonathan M. Marks, in his                    :
Official Capacity as Commissioner,               :
Bureau of Commissions, Elections                 :
and Legislation, Department of State,            :
Commonwealth of Pennsylvania,                    :   No. 435 M.D. 2016
                         Respondents             :   Argued: February 8, 2017


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE ROBERT SIMPSON, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE JULIA K. HEARTHWAY, Judge
          HONORABLE JOSEPH M. COSGROVE, Judge


DISSENTING OPINION
BY JUDGE COSGROVE                      FILED:  September 18, 2017


        While I respect the well-crafted and well-reasoned Majority opinion,

the decision in *Appeal of Magazzu,* 49 A.2d 411 (Pa. 1946) compels my dissent.  In

that case, the Supreme Court permitted a candidate, who had filed nominating

petitions as a member of one party, to receive the nomination of another party for

the same office.  Thus, while our Election Code[1] (except in local judicial and

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600 - 3591.

school director races) prohibits "fusion" candidacies (i.e., "the nomination by more than one political party of the same candidate for the same office in the same general election," *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 353 n.1 (1997), and while such prohibitions are constitutional, *Timmons*, the holding in *Magazzu* makes an exception for candidates who are nominated by the opposing party through the write-in process. As a result, and pursuant to what Working Families Party calls the "*Magazzu* loophole," Majority, slip op. at 10, a *major* party may, through the write-in process, nominate a candidate who has also filed petitions seeking the nomination of the other *major* party.

By way of example, assume Candidate X files petitions seeking the nomination of the Democratic Party in the primary, and prevails. Candidate X also receives more votes (through write in) than all the candidates who filed nominating petitions on the Republican side. Candidate X is now the candidate of both the Democratic and Republican parties in the General Election. But he or she is not, and cannot be, placed on the ballot as the candidate of a minor party or a political

This avenue is not, however, available to minor parties or political bodies since they do not nominate their candidates in the primary but must do so through a labor intensive gathering of signatures.[2] Under the provisions challenged in this case, these non-major parties are prohibited from nominating someone who has filed nominating petitions for one of the major parties. It is that simple and, as such, is constitutionally infirm.

---

[2] While the number of signatures required for placement on the ballot is fluid (depending on the results in the previous election), and can be extraordinarily high pursuant to Section 951(b) of the Election Code, 25 P.S. § 2911(b), the Secretary of the Commonwealth "is not enforcing" the mechanism which determines this number "[a]s a result of a federal district court order" filed in *Constitution Party of Pennsylvania v. Cortés*, 824 F.3d 386 (3rd Circuit 2016), but instead is requiring a static and diminished number of signatures. *See* Pennsylvania Department of State Political Body Nomination Paper General Instructions Sheet, available at http://www.dos.pa.gov/VotingElections/CandidatesCommittees/RunningforOffice/Documents/2017%20PB%20Nomination%20Paper%20Instructions%20(KMK%20edits)%20with%20chart.pdf (last viewed August 17, 2017).

body. He or she may be the unanimous choice of such a minor party or political body; he or she may have garnered the requisite number of signatures required of such organizations to secure a spot on the ballot in their name; but the provisions in question in this case prohibit this candidate from receiving this nomination.

The Majority suggests that *Magazzu* does not inhibit the minor parties/political bodies since they can likewise mount write-in campaigns during the primary and thus seek a major party's nomination for the candidate of their choice. What the Majority seems to miss, however, is that unlike the major parties, the minor parties/political bodies cannot employ the nominating process to which they are relegated (i.e., collection of the high number of signatures necessary to place their candidate on the general election ballot) for a candidate who had also submitted nominating petitions for one of the major parties during the primary.[3] This distinction is so directly contrary to the concept of equal protection that it cannot survive scrutiny on any level under the Fourteenth Amendment. U.S. CONST. amend. 14.

The decision of the United States Court of Appeals for the Third Circuit in *Reform Party v. Allegheny County Department of Elections*, 174 F.3d 305 (3rd Cir. 1999) offers a framework for application of equal protection principles here. That case involved a question whether a statutory "ban on minor party 'cross-nominations' in certain local offices" was constitutional, since major parties were allowed to cross-nominate candidates in these particular local races. *Reform Party*, 174 F.3d at 308. As these provisions had already been declared

---

[3] The Majority correctly notes that a political body/minor party candidate "who has filed the requisite nomination papers *prior* to the primary election can also win the write-in vote for a major party in the primary, and thus, appear on the general election ballot on behalf of a major party." Majority, slip op. at 13 (emphasis added). What the political body/minor party *cannot* do, however, is submit nomination *papers* for a candidate who has also submitted a nomination *petition* for inclusion on the primary ballot of one of the major parties. A major party may, however, nominate by write in someone who *has* submitted a nomination petition for the other party's primary.

JMC-3

unconstitutional by the Third Circuit in *Patriot Party of Allegheny County v. Allegheny County Department of Elections,* 95 F.3d 253 (3rd Cir. 1996), the *Reform Party* court revisited the question in the aftermath of *Timmons*, and reaffirmed its earlier ruling that "Pennsylvania's decision to ban cross-nomination by minor parties and to allow cross-nomination by major parties constitutes the type of 'invidious discrimination' prohibited by the Fourteenth Amendment." *Reform Party*, 174 F.3d at 310.

The Majority distinguishes *Reform Party* since it addressed a matter of facial discrimination, where the provisions at issue here, according to the Majority, are not facially discriminatory. This distinction, however, does not excuse the Election Code's constitutional impairment vis-à-vis minor political parties and political bodies since it was the disparate treatment of these organizations as compared to major parties which *Reform Party* condemned. Further, stapled to the "*Magazzu* loophole," the provisions in question here are thus, indeed, "facially discriminatory," *Reform Party*, with no countervailing state interest to sustain them. Contrary to the Majority's view, the reasoning of *Reform Party* is equally as applicable here as it was in that case.

If *Magazzu* is as limited as the Majority suggests,[4] then it creates a distinctly exclusive political club with only the two major parties as members. So-

---

[4] The Majority notes that in *In re Street*, 451 A.2d 427 (Pa. 1982) "our Supreme Court rejected an equal protection challenge to the anti-fusion provisions of the Election Code, and it did so more than 30 years after its holding in *Magazzu*." Majority, slip op. at 21. While this is so, the *Street* Court also reaffirmed *Magazzu* in a footnoted reference: "Aside from the three offices for which cross-filing of nominations is permitted (judge of a court of record, elected school director and justice of the peace), cross-filing is permitted in the general election only when, in addition to obtaining the nomination of a political party or political body through the filing of nomination petitions or nomination papers, a candidate receives a write-in nomination in another party's primary. *See Magazzu Election Case*, 355 Pa. 196, 49 A.2d 411 (1946)." *In re Street*, 451 A.2d at 430, n.7.

called minor parties, such as Working Families Party, are not invited to this club and are unable to enjoy these particular fruits of membership. This cannot withstand constitutional muster even under the most relaxed standard.

Perhaps the Supreme Court got it wrong when it created the "*Magazzu* loophole." If so, that Court will have to correct it by overruling this nearly seventy-year-old decision. Since that is something we cannot do, we must apply *Magazzu's* rationale evenly and equally. I do not believe the Majority opinion fulfills this responsibility, and therefore, I must dissent.

_____
JOSEPH M. COSGROVE, Judge