**[J-61-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| WORKING FAMILIES PARTY, CHRISTOPHER M. RABB, DOUGLAS B. BUCHHOLZ, AND KENNETH G. BEISER, | : : : : | No. 34 EAP 2017 |
| | : | Appeal from The Order of |
| | : | Commonwealth Court entered on |
| Appellants | : | September 18, 2017 at No. 435 MD |
| | : | 2016. |
| | : | |
| v. | : | ARGUED: September 25, 2018 |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, ROBERT TORRES, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA AND JONATHAN M. MARKS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER, BUREAU OF COMMISSIONS, ELECTIONS AND LEGISLATION, DEPARTMENT OF STATE, COMMONWEALTH OF PENNSYLVANIA, | : : : : : : : : : : : : : | |
| | : | |
| Appellees | : | |


**OPINION**


**JUSTICE MUNDY**                                        **DECIDED: June 5, 2019**


In this direct appeal from an order of the Commonwealth Court, we are asked to determine the constitutionality of provisions of the Election Code[1] that prohibit fusion, the

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591.

process by which two or more political organizations place the same candidate on the ballot in a general election for the same office.

In the April 26, 2016 primary election, Christopher M. Rabb (Rabb) secured the nomination of the Democratic Party as its candidate for Representative of the General Assembly's 200th Legislative District. Between July 18 and July 26, 2016, the Working Families Party (Working Families) circulated papers to also nominate Rabb as its candidate for the same race. On July 27, 2016, Working Families submitted the following documents to the office of Commissioner Jonathan M. Marks, Department of State, Bureau of Commissions, Elections and Legislation: nomination papers with 958 signatures of registered voters in the 200th Legislative District, Rabb's statement of financial interests, the appropriate filing fee, and a candidate affidavit through which Rabb struck the following language:

> [M]y name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor have I been nominated by any other nomination papers for any such office; that if I am a candidate for election at a general or municipal election I shall not be a registered and enrolled member of a political party at any time during the period of thirty (30) days prior to the primary up to and including the day of the following general or municipal election.

Petition for Review, 8/5/16, at ¶ 25. He also added the following italicized text to the affidavit:

> I swear (or affirm) to the above parts as required by the laws applicable to the office I seek, *having struck out certain parts based on my honest and sincere belief that they are violative of the Pennsylvania and U.S.* [C]*onstitutions.*

*Id.*

The same day, Commissioner Marks issued a nomination paper rejection notice stating that Rabb had altered the statutory candidate affidavit. On July 29, 2016, Commissioner Marks issued an amended rejection notice indicating:

> The candidate altered the form of the statutory candidate affidavit. Subsequent to the Bureau's initial review, Bureau staff also noted during a review of its candidate list that the candidate's name was already presented by nomination petitions in the General Primary, which precludes the candidate from seeking the nomination of a political body pursuant to 25 P.S. §2911(e)(5).[2]

*Id.* at ¶ 29.

On August 5, 2016, Working Families, Rabb, and two unaffiliated registered voters who reside in the 200th Legislative District, Douglas B. Buchholz and Kenneth G. Beiser, (collectively "Appellants") filed an action against the Commonwealth, the Secretary of the Commonwealth Pedro A. Cortes and Commissioner Marks (hereinafter, the Commonwealth), challenging the Commissioner's rejection of Rabb's nomination papers. In Count I, they sought a declaratory judgment that Sections 634, 910, 951, 976, 979, 980 and 1406 of the Election Code, 25 P.S. §§ 2870, 2911, 2936, 2939, 2940, 2784, and 3156[3] violate various clauses of the federal and state constitutions. *Id.* at ¶¶ 34-40, 92-

---

[2] Section 951(e)(5) of the Election Code provides that the candidate shall append to each nomination paper an affidavit stating "that his name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor has he been nominated by any other nomination papers filed for any such office." 25 P.S. § 2911(e).

[3] Each of these sections effectively ensure that cross-nominations do not occur. Sections 634 and 910 of the Election Code, 25 P.S. §§ 2870 and 2911, require all candidates to file an affidavit that they have not received any other nominations. Section 976 of the Election Code, 25 P.S. § 2936 requires the Secretary of the Commonwealth to reject any nomination petitions if the nominee in question has already been nominated by another entity. Sections 979 and 980 of the Election Code, 25 P.S. §§ 2939 and 2940 prohibit

94. In Count II, they sought a writ of mandamus directing the Commonwealth to accept Rabb's nomination papers and to prepare a general election ballot listing Rabb as both the Democratic and Working Families candidate. *Id.* at 97-101.

Because there were no disputed issues of fact, the court directed the parties to file applications for summary relief. Oral argument was held before a panel of the Commonwealth Court, following which it denied Working Families' request for summary relief on Count II, having concluded that mandamus was an inappropriate means by which to test the constitutionality of a statute. Accordingly, by order dated September 30, 2016, it dismissed Count II of the petition for review. Argument on the parties' applications for summary relief on Count I (declaratory relief), was heard by the court en banc on February 8, 2017. On September 18, 2017, the Commonwealth Court denied Appellants' application for summary relief and granted the Commonwealth's cross-application for summary relief in a published opinion. *Working Families Party et al. v. Commonwealth*, 169 A.3d 1247 (Pa. Cmwlth. 2017) (en banc).

The court began by observing that fusion was commonly permitted by many states, including Pennsylvania, throughout the 19th and early 20th centuries. To counteract this, the General Assembly enacted the Election Code, which included the challenged anti-fusion statutes in order to remedy a practice known as "party-raiding," which the court defined as "the organized switching of blocks of voters from one party to another in order

---

any political entity, in the event of a vacancy on the ballot, from nominating any substitute candidate who has already been nominated. Section 634 of the Election Code, 25 P.S. § 2784 imposes this same requirement for special elections. Section 1406 of the Election Code, 25 P.S. § 3156, prohibits the aggregate tabulation of votes for the same candidate who appears more than once on the same ballot for the same race.

to manipulate the outcome of the other party's primary election." *Working Families Party*, 169 A.3d at 1251 (citation omitted).

The Election Code divides political groups into two categories, political parties and political bodies. A political party is a group "whose candidates at the general election next preceding the primary polled in each of at least ten counties of the State not less than two per centum of the largest entire vote cast in each of said counties for any elected candidate, and polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate[.]" 25 P.S. § 2831(a). A group that does not achieve this goal is labeled as a "political body." *Id.* § 2831(c). A political body cannot use the primary process to nominate candidates, but instead does so by collecting signatures. As noted above, Section 2911(e)(5) prohibits fusion by requiring the candidate of a political body to affirm that he or she is not presented as a candidate for another political body or party for that same election.[4]

Appellants conceded that the challenged statutes prohibit fusion in state-level races, but argued that a loophole exists based on this Court's decision in *Appeal of Magazzu*, 49 A.2d 411 (Pa. 1946). In the Appellants' view, *Magazzu* permits political parties to engage in fusion for state and federal legislative seats, but effectively bars political bodies from doing so.

In *Magazzu*, the appellee was a primary nominee for the Republican Party in a state house race, but did not prevail. The only potential Democratic nominee for that race was Milo Serfas. *Magazzu*, 49 A.2d at 412. When the primary votes were tallied on the Democratic side, it was discovered "Magazzu's name had been written or stamped upon the voting machine paper ballot in sufficient numbers to cause Magazzu to receive a

---

[4] As noted above, the Commonwealth Court pointed out that the Election Code also prohibits political parties from engaging in fusion as well. *See generally* 25 P.S. §§ 2870, 2939.

substantial majority of the Democratic votes." *Id.* The Luzerne County Board of Elections refused to certify Magazzu as the winner of the Democratic primary, but a judge of the court of common pleas reversed. Upon further appeal by Serfas, this Court affirmed. We began by noting that the Election Code contains many anti-party raiding or anti-fusion provisions and they prohibit "a candidate to file petitions of more than one political party for the same office and the printing of the name of a candidate of more than one political party." *Id.* However, this Court concluded that the same prohibition did not apply to write-in votes, observing that "[n]owhere in the act, or its amendments, is there a prohibition against a voter writing in or pasting in the name of a person for whom he desires to vote if such name is not printed on the ballot of the political party of which the voter is a member." *Id.* Looking at other provisions of the Code, the Court observed that a write-in vote was explicitly authorized. *Id.* Therefore, the Court viewed the votes as valid and not barred by the anti-fusion provisions of the Code, and Magazzu was the proper winner of the Democratic primary.

Turning back to this case, the Commonwealth Court held that *Magazzu* did not support Appellants' position. In the court's view, "*Magazzu* stands for the simple proposition that in a primary election, a voter may write in the name of any person not printed on the ballot of the political party to which the voter belongs." *Working Families Party*, 169 A.3d at 1254-55 (internal quotation marks and citation omitted). The court further observed that a political body may accomplish the same objective. *Id.* at 1255. Therefore, the court disagreed that *Magazzu* had created a "loophole" in the anti-fusion statutes.

The court next turned to Appellants' only federal constitutional challenge. Appellants alleged that the anti-fusion statutes violate the Equal Protection Clause of the Fourteenth Amendment insofar that they have a disparate impact on political bodies

versus political parties. Specifically, Appellants averred that in practice, the statutes impose a legal disability on political bodies by making it more difficult for them to fuse their candidates. A major political party can nominate a candidate in a primary and then simultaneously launch a write-in campaign for the other major party's nomination. The Commonwealth Court acknowledged that the process for political bodies was different. To nominate its own candidate, a political body must file its nomination papers before August 1, but to also have that same candidate appear on the ballot for a major party as a write-in candidate, he or she must file the appropriate nomination papers before the primary election, which is typically scheduled for the third Tuesday in May. *Id.* at 1255-56; *see also* 25 P.S. § 2753(a).

The court rejected the Appellants' argument that the anti-fusion statutes create a legislative classification implicating the fundamental right to vote, which in its view would trigger strict scrutiny. Relying on this Court's opinion in *In re Street*, 451 A.2d 427 (Pa. 1982),[5] the court observed that the anti-fusion statutes as written were facially neutral and did not create a legislative classification of any kind, since they applied to both political parties and political bodies. *Working Families Party*, 169 A.3d at 1258.

In *Street*, the appellant was a third-party candidate for a congressional race, nominated by the self-titled "Milton Street Party." *Street*, 451 A.2d at 427. Subsequent to Street's nomination, the Republican candidate who had won the primary withdrew from the race. *Id.* Street sought to substitute his name for the withdrawn candidate on the Republican ticket. *Id.* All parties acknowledged that this violated 25 P.S. § 2939 which, as noted above, prohibits any political entity from filling a ballot vacancy with a substitute candidate who has already been nominated by another entity. *Id.* at 428. However, Street

---

[5] Although *Street* bears the title "Opinion," it is a plurality. Two Justices joined the opinion, one Justice concurred in the result, and three Justices dissented.

contended this violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. We held that the Election Code's anti-fusion statutes were facially neutral as written and that treating political parties and political bodies differently did not amount to an equal protection violation. *Id.* at 431. Specifically, we observed that "political parties and political bodies are treated equally: neither may nominate, either initially or through substitution, a candidate for the general election who has already been nominated by another political group." *Id.* Although the Commonwealth Court acknowledged that *Street* only discussed Section 2939, it viewed *Street* as dispositive of Appellants' equal protection claim as to all of the anti-fusion statutes. *Working Families Party*, 169 A.3d at 1259.

The court also rejected Appellants' reliance on *Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305 (3d Cir. 1999), which concerned other provisions of the Election Code allowing fusion by major political parties in local races but explicitly prohibiting minor political parties from doing the same. The court reasoned that the provisions at issue were not facially neutral, whereas the anti-fusion provisions at issue in this case were facially neutral. *Working Families Party*, 169 A.3d at 1259. The court also noted that the Third Circuit did not apply strict scrutiny, as Appellants argue here, but rather applied intermediate scrutiny. *Id.* The court appeared to agree this was the correct level of review, as it further concluded the Commonwealth provided a justification for the burden that meets the intermediate standard of review applied in *Reform Party*. *Id.* Based on these considerations, the Commonwealth Court concluded Appellants' equal protection issue lacked merit.

The court next turned to Appellants' state constitutional claims, electing to first address their free speech and association rights claims together.[6] The court acknowledged that these are fundamental rights and that our state charter may afford greater protection than the First Amendment. *Working Families Party*, 169 A.3d at 1260. However, the court criticized Appellants for not conducting an analysis pursuant to *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), to explain why the state constitution should grant higher speech and associational protections in this case. *Working Families Party*, at 1262.[7] Therefore, the court relied strictly on First Amendment standards.

The court then considered *Street*, in which this Court concluded that the First Amendment does not prohibit the General Assembly from enacting anti-fusion statutes. Specifically, we observed the following.

> While the right to associate for the advancement of political beliefs includes the right to advance a candidate who represents those interests, the 'ballot access' cases of the United States Supreme Court make it clear that the right of association does not encompass the right to nominate as a candidate a particular individual who fails to meet reasonable eligibility requirements.

---

[6] The Free Speech Clause states that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." PA. CONST. art. I, § 7, cl. 2. The Association Clause states "[t]he citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance." *Id.* at art. I, § 20.

[7] In *Edmunds*, we explained that where a party seeks to have this Court decide an issue based on a provision of the Pennsylvania Constitution, "it is important that litigants brief and analyze at least the following four factors: 1) the text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." 586 A.2d at 895.

*Street*, 451 A.2d at 432.

The court then noted that the decision of the Supreme Court of the United States in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) was instructive. In *Timmons*, the Court considered Minnesota's anti-fusion statutes and whether they violated the expressive associational rights protected by the First Amendment. The Court held that while a political party has the right to select the candidate of its choice, "[t]hat a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights." *Timmons*, 520 U.S. at 359.

With respect to the instant matter, the court held that the Commonwealth had offered an important regulatory interest sufficient to justify the anti-fusion statutes. Specifically, the Commonwealth Court posited that "[i]f fusion were permitted, Rabb's name, for example, would have appeared on the general election ballot with the designation 'Democratic Party/Working Families Party.'" *Id.* at 1263. The court continued that Rabb "would not appear twice, *i.e.*, once as a candidate of the Democratic Party and again as a candidate of the Working Families Party." *Id.* Because the Election Code does not contain a mechanism for apportioning vote tallies, the court concluded that "it would be impossible to determine whether the support for the candidate came from the votes of the political party or from the political body." *Id.* The Commonwealth Court observed that "[t]he Election Code designates a political organization as either a political party or a political body based on [the percentage of votes obtained] in the preceding general election." *Id.*; *see also generally* 25 P.S. § 2831. Therefore, the court noted the importance of the Commonwealth's ability to determine which candidates are supported by how many voters.

The court continued that the anti-fusion statutes also serve an important interest of protecting the general election representation of third parties. The court posited that

"[i]f fusion were permitted, members of a major political party could, during and after the primary election, circulate nomination papers to name the major party's nominated candidate as the nominee of a political body without the consent of any members of the political body." *Id.* In the court's view, because political parties have superior resources and manpower, the parties could easily impersonate a political body and submit its candidate under a third party's name, just as long as the major party is the first to file its papers with the Secretary of the Commonwealth. *Id.* at 1264. The court held this would result in fewer candidates appearing on the ballot overall. *Id.* Based on these considerations, the Commonwealth Court concluded the anti-fusion statutes did not violate the speech or expressive association rights of the Pennsylvania Constitution.

The Commonwealth Court next addressed Appellants' argument under the Free and Equal Elections Clause.[8] The Appellants' position was that "the anti-fusion provisions of the Election Code deny voters the right to have their vote counted in a way that reflects their true party preference." *Id.* Stated another way, Appellants believed "that it is imperative that representatives know the values of those who vote for them, and cross-nomination enables some record of this by permitting members of political bodies to 'vote their values without wasting their votes.'" *Id.* The court observed that all voters have an obvious right to cast their ballots and to have those ballots counted. However, the court pointed out that in the general election for 2016, Rabb was indeed on the ballot for the Democratic Party. *Id.* at 1265. Therefore, all members of Working Families Party who voted in the 2016 election had the opportunity to vote for Rabb as their preferred candidate for the state house.

---

[8] The Free and Equal Elections Clause states, "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, § 5. The Commonwealth Court did not have the benefit of our opinion in *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018) at the time of its decision.

Finally, the court rejected Appellants' last contention that "the anti-fusion provisions are a product of the major political parties' effort to prevent the free exercise of the right of suffrage." *Id.* Appellants' provided no evidence to support this notion and the court observed "the 'motive' of an individual legislator voting on legislation is irrelevant to the constitutionality of a collective work product." *Id.* As it had addressed all of Appellants' substantive arguments the court declined to further consider what it deemed to be Appellants' "bald assertions of legislative conspiracy." *Id.* The Commonwealth Court concluded none of Appellants' claims had any merit. As a result, the court granted the Commonwealth's application for summary relief and denied Appellants' application for summary relief.

Judge Cosgrove filed a dissenting opinion expressing his disagreement with the majority's treatment of *Magazzu*. While recognizing that anti-fusion statutes are constitutional, he asserted that "*Magazzu* makes an exception for candidates who are nominated by the opposing party through the write-in process. As a result, . . . a *major* party may, through the write-in process, nominate a candidate who has also filed petitions seeking the nomination of the other *major* party." *Id.* at 1266. Judge Cosgrove concluded that the Majority's observation that all parties may mount write-in campaigns misses the point because "unlike the major parties, the minor parties/political bodies cannot employ the nominating process to which they are relegated (i.e. collection of a high number of signatures necessary to place their candidate on the general election ballot) for a candidate who had also submitted nominating petitions for one of the major parties during the primary." *Id.* at 1267. Judge Cosgrove opined that this distinction violates equal protection under the Fourteenth Amendment.

The dissent also disagreed with the Majority's conclusion that *Reform Party* was inapposite because the statute in that case treated major and minor parties differently,

while the statutes at issue in this matter were party neutral. In Judge Cosgrove's view, that "does not excuse the Election Code's constitutional impairment vis-à-vis minor political parties and political bodies since it was the disparate treatment of these organizations as compared to major parties which *Reform Party* condemned." *Id.* at 1267.

## Appeal to This Court

On October 17, 2017, Appellants filed a notice of appeal to this Court from the order of the Commonwealth Court dated September 18, 2017, denying Appellants' application for summary relief and granting the Commonwealth's cross-application for summary relief. They filed a jurisdictional statement citing to Section 723(a) of the Judicial Code, which provides, in relevant part, "[t]he Supreme Court shall have exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court." 42 Pa.C.S. § 723(a). On December 6, 2017, this Court issued an order noting probable jurisdiction and directing Appellants to address whether the notice of appeal was timely pursuant to Pennsylvania Rule of Appellate Procedure 903(c)(1)(ii), which provides, in relevant part, "(c) Notwithstanding any other provision of this rule: (1) An appeal from any one of the following orders shall be taken within ten days after the entry of the order from which the appeal is taken: . . . (ii) an order in any matter arising under the Pennsylvania Election Code." Pa.R.A.P. 903(c)(1)(ii).

Appellants note that Count 1 of their petition filed in the Commonwealth Court sought a declaratory judgment that the fusion ban violates the Pennsylvania and United States Constitutions. Appellants' Brief at 57. Count II sought a writ of mandamus directing the Commonwealth to accept Rabb's nomination papers and to prepare a ballot reflecting his nomination by both the Working Families Party and the Democratic Party.

*Id.* The instant appeal is limited to the constitutional issues addressed in the declaratory judgment action, and does not "arise under" the Election Code because it does not seek the enforcement, interpretation or application of the Code. Rather, the issue is the constitutionality of the Code. By way of comparison, where objections are filed to a nomination petition or paper, the court must schedule a hearing no later than ten days after the last day for filing the nomination petition or paper, and shall issue a final determination no later than fifteen days after the last day for filing such petition or paper. *See* Section 977 of the Election Code, 25 P.S. § 2937. Such an order is subject to the ten-day appeal period of Rule 903(c)(1)(ii), which is consistent with the expedited process for challenges under the Election Code. Because the instant action sought as relief a determination that the challenged sections of the Election Code were unconstitutional, the thirty-day appeal period for a declaratory judgment matter is appropriate. Accordingly, the instant appeal was timely filed.

<u>Free and Equal Elections Clause</u>

As a preliminary matter, we note:

> It is axiomatic that: "[A]ny party challenging the constitutionality of a statute must meet a heavy burden, for we presume legislation to be constitutional absent a demonstration that the statute 'clearly, palpably, and plainly' violates the Constitution." *Konidaris v. Portnoff Law Associates, Ltd.*, 953 A.2d 1231, 1239 Pa. (2008) (citation omitted). The presumption that legislative enactments are constitutional is strong. *Commonwealth v. McMullen*, 961 A.2d 842, 846 (2008); *see also* 1 Pa.C.S. § 1922(3) (in ascertaining intent of General Assembly in enactment of statute, presumption exists that General Assembly did not intend to violate federal and state constitutions). All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster. *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, , 877 A.2d 383, 393 (2005). Moreover, "statutes are to be

construed whenever possible to uphold their constitutionality."
*In re William L.*, 383 A.2d 1228, 1231 (1978).

*DePaul v. Commonwealth*, 969 A.2d 536, 545-46 (Pa. 2009).

Appellants first assert in this Court that the ban on cross-nomination by political bodies violates the Free and Equal Elections Clause of the Pennsylvania Constitution. They note that in *League of Women Voters, supra*, this Court stated:

> The broad text of the first clause of this provision mandates clearly and unambiguously, and in the broadest possible terms, that all elections conducted in this Commonwealth must be "free and equal." In accordance with the plain and expansive sweep of the words "free and equal," we view them as indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government. Thus, Article I, Section 5 guarantees our citizens an equal right, on par with every other citizen, to elect their representatives. Stated another way, the actual and plain language of Section 5 mandates that all voters have an equal opportunity to translate their votes into representation.

*League of Women Voters*, 178 A.3d at 804. Furthermore, "[t]he Free and Equal Elections Clause was specifically intended to equalize the power of voters in our Commonwealth's elections process, and it explicitly confers this guarantee[.]" *Id.* at 812.

Appellants note that since 2002, at least 101 candidates have received the nomination of both major parties while during the same period, no political body or minor party (PBMP) candidate has been cross-nominated with another PBMP or major party candidate. Appellants' Brief, at 24. They attribute this to the relatively straightforward process for cross-nomination available to a major party candidate. For example, a

Democratic candidate for the state legislature who appears on the ballot in the party's primary, can also encourage voters in the Republican primary to write in his name. If the candidate wins both primaries, he will appear on the general election ballot as the candidate of both parties, with votes cast on both lines counting toward the candidate's total against any third party challengers. In contrast, a PBMP that wants to cross-nominate a major party candidate pursuant to *Magazzu* must follow a much more complicated path. Any major party candidate chosen by the PBMP would have to renounce his party membership at least thirty days before the primary and agree not to circulate nominating petitions during the petition circulation period. The chosen candidate and the PBMP would then have to satisfy the signature requirements for nomination by a PBMP in the ten weeks before the primary election. Once the nomination papers are accepted by the Department of State, the PBMP would have to wage a write-in campaign for the major party candidate who chose to forego participating in the major party's primary by seeking the PBMP nomination. *Id.* at 25-26.

While Appellants acknowledge that the anti-fusion statutes apply equally to major party and PBMP candidates, they argue that in practice, combined with *Magazzu*, the statutes work to the disadvantage of PBMP candidates. *Id.* at 27. They maintain that the nomination process for candidates is an essential part of the electoral process, and therefore must be "kept open and unrestricted to the voters of our Commonwealth." *League of Women Voters*, 178 A.3d at 804. Accordingly, the process must be "conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process." *Id.* Appellants argue that, "[w]hile a major political party can choose as its nominee the candidate of another major political party, a PBMP cannot do so." Appellant's Brief, at 28. This, they assert, is contrary to Article I, Section 5 because it deprives them of "an equal opportunity to translate their votes into

representation." *League of Women Voters*, 178 A.3d at 804. They further argue that the limits on fusion entrench the power of the major political parties and dilute the votes of members PBMPs. Appellants' Brief at 28-29.

Appellants also criticize the Commonwealth's contention that the anti-fusion statutes protect PBMPs from major political parties. *Id.* at 33. Rather, if a major political party attempts to manipulate the nomination process by nominating its own candidate under the name of a PBMP, the PBMP already has an existing remedy available in the form of objections to nomination papers under Section 977 of the Code, 25 P.S. § 2937. *Id.* at 35-36. Because the Code already provides this protection to PBMPs, the anti-fusion provisions are not necessary to protect the interests of PBMPs.

The Commonwealth counters that *League of Women Voters* is inapposite to this case in several respects, notably because the anti-fusion provisions are neutral and did not discriminate against the Working Families Party or its members' right to vote. Commonwealth's Brief at 33. The Commonwealth emphasizes that Rabb was on the ballot for any members of the Party who wished to vote for him, regardless of whether his name appeared under the designation of the Democratic Party or another party. Therefore, the Commonwealth argues that there is no vote dilution by operation of the anti-fusion statutes. Relying primarily on *Street*, the Commonwealth emphasizes that the anti-fusion statutes are themselves politically neutral on their face, applying equally to major and third parties. *Id.* at 34. In the Commonwealth's view, the Party was free to endorse Rabb, campaign for him and contribute money to his candidacy. *Id.*

The Commonwealth also characterizes Appellants' heavy reliance on *Magazzu* as a "red herring." *Id.* at 35. In its words, "[t]he fact that this Court recognized a limited judicial exception to the Legislature's anti-fusion provisions in *Magazzu* simply does not support the broader proposition that anti-fusion requirements violate the [Elections

Clause] of the Pennsylvania Constitution in all cases." *Id.* The Commonwealth posits that if Appellants prevail, two things would occur. First, fusion "would make it impossible to calculate the true number of votes for the Working Families Party, essentially rendering meaningless the percentage-based vote-calculations set forth in 25 P.S. § 2831." *Id.* at 38. The Commonwealth also argues that fusion would actually hurt third parties by permitting the two major parties to obtain the ballot position of third parties by simply circulating nominating petitions for its candidate under the banner of as many third parties as it could. *Id.* at 39. The Commonwealth views this as permitting the major parties "to 'squeeze out' the candidates of minor political parties and political bodies[,] leaving voters with even fewer candidates to choose from." *Id.* at 40.

In setting forth the history of the Free and Equal Elections Clause, this Court in *League of Women Voters* cited *Patterson v. Barlow*, 60 Pa. 54 (1869), for the proposition that "any legislative scheme which has the effect of impermissibly diluting the potency of an individual's vote for candidates for elective office relative to that of other voters will violate the guarantee of "free and equal elections afforded by Article I, Section 5." *League of Women Voters*, 178 A.3d at 809. The Court also noted a case wherein we stated:

> [E]lections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as every other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

*Id. at* 810 (quoting *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914)).

The Court next discussed *Shankey v. Staisey*, 257 A.2d 897 (Pa. 1969), a case in which:

> [A] group of third-party voters challenged a Pennsylvania election statute which specified that, in order for an

individual's vote for a third-party candidate for a particular office in the primary election to be counted, the total number of aggregate votes by third-party voters for that office had to equal or exceed the number of signatures required on a nominating petition to be listed on the ballot as a candidate for that office.

*Id.*, at 812. With respect to a challenge under the Free and Equal Elections Clause, the *Shankey* Court stated:

There seems no question as to 'freedom'; each voter can vote for whomever he chooses. The complaint is as to 'equality' - that the statute wrongfully equates public petitions with secret ballots so as to deny the ballots of people who voted for [plaintiffs] the same weight as the ballots of people who voted for major party candidates. The statute, however, promotes 'equal' elections by requiring every candidate who desires to appear on the general electoral ballot to have satisfied the same condition - the show of support by a set number of people. This can be done by petition or by primary election victory, and what is important is not that ballots and petitions are equated but that the number of people behind each are equated. Any other system would create unequal elections by giving minority party candidates and their supporters the advantage of not having to secure the same showing of public support before being put on the ballot as required by a majority party candidate.

*Shankey*, 257 A.2d at 899.

As this Court clearly articulated, "the overarching objective of [Article I, Section 5] of our constitution is to prevent dilution of an individual's vote by mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens." *League of Women Voters*, 178 A.3d at 817. Viewed from this perspective, Appellants have not established that their votes were diluted by the ban against cross-nomination. Here, Appellants had the opportunity to support and vote for the candidate of their choice in the 2016 general election. In no sense were their votes diluted by the fact that Rabb appeared on the ballot only as the

candidate of the Democratic Party.  Here, Appellants had "the same right as every other voter," and thus the foundational principle underlying Article 1, Section 5 is not offended. *See Winston*, 91 A. at 523.

Appellants' argument with respect to *Magazzu* does not warrant relief under the Free and Equal Elections Clause.  *Magazzu* stands for the unremarkable principle that a successful write-in candidate may be declared the winner of a primary election.  As recognized by the Commonwealth Court, "[t]he potential for fusion by a successful write-in campaign is not limited to major party candidates.  The same may be accomplished by a political body." *Working Families Party*, 169 A.3d at 1265.  Even in a situation where one candidate appears on a ballot with two major party designations due to write-in votes in a primary election, the Commonwealth Court correctly noted that voting rights in the general election are not affected because "[a] voter supporting such a candidate is not in a position superior to the voter casting his ballot for a candidate having a single political designation.  In such scenario the vote is counted once."  *Id.* at 1265.

## Equal Protection

Appellants further assert that the fusion ban violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  They aver that the holding in *Magazzu* works in concert with the anti-fusion statutes to allow for cross-nominations by major parties while effectively precluding PBMPs from doing the same in light of the complicated path outlined above for PBMPs to fuse with major party candidates in elections for legislative offices.  Appellants' Brief at 41.

In *Street*, this Court held that the anti-fusion provision of Section 979 of the Election Code that prohibits a political party from substituting a candidate with a person who has already been nominated for the same office by a political party or political body does not

offend equal protection. The Court further stated that "[u]nder Pennsylvania's Election Code . . ., political parties and political bodies are treated equally; neither may nominate, either initially or through substitution, a candidate for the general election who has already been nominated by another political group." *Street*, 451 A.2d at 431. Accordingly, the anti-fusion statutes are facially neutral.

Appellants rely on *Reform Party*, where the Third Circuit Court of Appeals considered a challenge to sections of the Election Code which prevented:

> minor political parties from cross-nominating a candidate for certain local offices when that candidate has already been nominated for the same office by another political party. The major parties, however, are allowed to engage in cross nomination or "fusion" for those local offices. As a consequence, while Pennsylvania prohibits all parties from cross-nominating the same person for most state offices, it makes an exception for primary elections for five local offices, in which major parties are permitted to cross-nominate each other's candidates, but minor parties are prohibited from so doing.

*Reform Party*, 174 F.3d at 308. The court determined that an intermediate level of scrutiny was appropriate for the equal protection claim, requiring it "to weigh, against the burdens imposed, any plausible justification the State has advanced for imposing unequal burdens on major and minor parties." *Id.* at 315. The court stated that the burden imposed by the statutes was "exacerbated because Pennsylvania has allowed the major parties to cross-nominate but has disallowed minor parties from doing the same." *Id.* Noting that while the Commonwealth's reasons for supporting the statutes might justify a general ban on cross-nomination, they were "not sufficiently weighty to justify a ban that discriminates between major and minor parties." *Id.* at 316. Accordingly, the Third Circuit Court of Appeals held that the prohibition against fusion by minor parties in local races violated the right to equal protection under the Fourteenth Amendment.

In the instant matter the Commonwealth has suggested justifications supporting the ban on fusion. It asserts that permitting fusion would cause considerable difficulties in the election administration process because a political organization's status as a political party is determined, in part, based on its performance in the preceding general election. 25 P.S. § 2831. Accordingly, each organization's status expires every two years. A political organization whose candidate receives two percent of the total votes cast for any candidate who is elected, both statewide and in at least ten counties, becomes a statewide political party. *Id.* § 2381(a). A political organization may also attain party status at the county level by having one of its candidates receive five percent of the vote in a given county at either the preceding general or municipal election. *Id.* § 2831(b). The anti-fusion statutes are relevant to these calculations. A candidate who is nominated by multiple political organizations, and who receives more than two percent of the vote, or five percent in a county, could raise all organizations he is associated with to political party status. The reason this does not occur is because the anti-fusion provisions establish a link between a vote for a candidate and a vote for the candidate's political party or body. *See* Commonwealth's Application for Summary Relief, 9/7/16, Exhibit A, Declaration of Jonathan Marks, 9/2/16, at 10-11.

If fusion were permitted, Rabb's name would appear once on the ballot next to the party names "Democratic Party/Working Families Party;" it would not appear twice, once next to Democratic Party and once next to Working Families Party. Because no procedure exists in the Election Code to disaggregate the votes received by Rabb in his capacity as the Democratic Party nominee and as the Working Families Party nominee, the Department would be unable to determine what proportion of the votes cast for Rabb should be allocated when making the five percent calculation to qualify the Working Families Party as a political party in Philadelphia County. *Id.* at 11-12.

The anti-fusion provisions of the Election Code are facially neutral as they apply equally to political parties and political bodies. *Magazzu* also applies equally to political parties and political bodies, allowing them to accomplish fusion through write-in votes. We agree with the Commonwealth Court's conclusion that "[t]he right to vote is not impacted by the anti-fusion provisions of the Election Code. Citizens of the Commonwealth are free to cast their vote for their candidate of choice, by write-in or otherwise." *Working Families Party*, 169 A.3d at 1259. Even if we were to determine that the Election Code and *Magazzu* work in concert to create a disparate impact on political bodies, the justification for the anti-fusion provisions raised by the Commonwealth is substantially related to an important governmental interest and therefore survives intermediate scrutiny. *See James v. Southeastern Pennsylvania Transportation Authority*, 477 A.2d 1302, 1307 (Pa. 1984).[9]

### Article I, Sections 7 and 20 of the Pennsylvania Constitution

Appellants next raise claims under the Free Speech and Association Clauses of the Pennsylvania Constitution. As noted above, the Free Speech Clause states that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and

---

[9] We reject as speculative the Commonwealth's argument that anti-fusion provisions actually protect political bodies. They posit that during and after primary election campaigns, a major party candidate backed by a strong organization could submit nomination papers in the name of a political body without the consent of any of its members. It notes that the Department accepts the first valid set of nomination papers bearing the name of any political organization, and rejects any nomination papers subsequently filed pursuant to Section 976, 25 P.S. § 2936 (No . . . nomination paper . . . shall be permitted to be filed if . . . (g) . . . the appellation set forth therein is identical with or deceptively similar to the words used by an existing party or by any political party which has already filed nomination papers for the same office. . . . .). Thus, they assert that the anti-fusion provisions prevent major parties from attempting to control the use of the names of their competitors. *See* Commonwealth's Application for Summary Relief, 9/7/16, Exhibit A, Declaration of Jonathan Marks, 9/2/16, at 8-9.

every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." PA. CONST. art. I, § 7, cl. 2. The Association Clause states "[t]he citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance." *Id.* at art. I, § 20.

At the outset, Appellants criticize the Commonwealth Court for not appreciating that they were asking for an independent state constitutional analysis. They acknowledge that they did not label their analysis as consistent with the requirements of *Edmunds*, but maintain they substantively "explore[d] the text of the Pennsylvania Constitution, its history and Pennsylvania case law, case law from other jurisdictions, and policy considerations." Appellants' Brief, at 45 n.11. Based on our review of Appellant's Memorandum of Law in Support of Motion for Summary Relief filed in the Commonwealth Court on September 2, 2016, we agree with Appellants that they properly preserved their state constitutional claims.

Noting that speech and association rights are at their core political rights, Appellants observe that our courts have traditionally given these two clauses a broad construction. *Id.* at 46-47 (collecting cases). Furthermore, Appellants note that this Court has already held that at least in some areas, the Pennsylvania Constitution grants broader protections of free expression than the First Amendment. *Id.* at 48-49 (citing *Pap's A.M. v. City of Erie*, 812 A.2d 591, 605-06 (Pa. 2002)). With regard to history, Appellants note that Pennsylvania's original 1776 Constitution was the first to explicitly have substantive protections for freedom of speech and assembly. *Id.* at 49.

Appellants maintain that the effect of anti-fusion statutes is to reduce third parties' participation in the electoral process and "denied [them] the freedom to express its choice of - and to associate with - the most attractive candidate willing to accept its nomination."

*Id.* at 50.  Appellants assert that the anti-fusion statutes infringe on their associational and expression rights because they legally forbid candidates from officially associating with a third party if they have already been nominated by a major party through the primary process.  *Id.*  Likewise, they maintain the statutes interfere with their ability to associate with a broader range of voters.  They note that the statutes also infringe on the rights of the major parties as well, because the major parties are not permitted to officially agree on a preferred candidate with a third party.  *Id.* at 51.

With respect to the protection for political expression and association, Appellants rely on our decision in *Commonwealth v. Tate*, 432 A.2d 1382 (Pa. 1981) wherein this Court explained:

> The "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), has special meaning for this Commonwealth, whose founder, William Penn, was prosecuted in England for the "crime" of preaching to an unlawful assembly and persecuted by the court for daring to proclaim his right to a trial by an uncoerced jury. It is small wonder, then, that the rights of freedom of speech, assembly, and petition have been guaranteed since the first Pennsylvania Constitution, not simply as restrictions on the powers of government, as found in the Federal Constitution, but as inherent and "invaluable" rights of man.

*Id.* at 1388.  While Appellants cite to several cases in which Pennsylvania courts highlight the importance of protecting speech and association, only one, *DePaul*, *supra*, relates even tangentially to elections.  In *DePaul*, this Court held that Section 1513 of the Race Horse Development and Gaming Act, 4 Pa.C.S. §1513, which prohibited certain classes of persons associated with licensed gaming in Pennsylvania from making political contributions to candidates for public office in Pennsylvania, to any political party committee in Pennsylvania or any group or association organized to support a candidate

in Pennsylvania, violated Article I, Section 7 of our Constitution. In reaching its decision the Court noted that "First Amendment authority remains instructive in construing Article I, Section 7[.]" *DePaul*, 969 A.2d at 547. Recognizing this point, the Commonwealth Court in the instant matter gave significant weight to *Timmons*, in which the New Party, a minor political party, sought to nominate Andy Dawkins as a candidate for Minnesota state representative. Dawkins had already filed to run as the candidate of a major political party, and was running unopposed. Although he filed a candidate affidavit for the New Party's nomination, it was rejected by election officials because he had already filed as a major party candidate. The New Party filed suit, asserting that the Minnesota election laws prevented it from selecting and associating with its candidate of choice. The United States Supreme Court noted:

> The New Party's claim that it has the right to select its own candidate is uncontroversial, so far as it goes. . . . That is, the New Party, and not someone else, has the right to select the New Party's standard bearer. It does not follow, though, that a party is absolutely entitled to have its nominee appear on the ballot as that party's candidate. . . . That a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights.

*Timmons*, 520 U.S. at 359 (internal citations omitted). The Court further explained:

> It is true the Minnesota's fusion ban prevents the New Party from using the ballot to communicate to the public that it supports a particular candidate who is already another party's candidate. . . . We are unpersuaded, however, by the party's contention that it has a right to use the ballot itself to send a particularized message to its candidate and to the voters, about the nature of its support for the candidate. Ballots serve primarily to elect candidates, not as forums for political expression. . . . Like all parties in Minnesota, the New Party is able to use the ballot to communicate information about itself and its candidate to the voters, so long as that candidate is not already someone else's candidate. The party retains

great latitude in its ability to communicate ideas to voters and candidates through its participation in the campaign, and party members may campaign for, endorse, and vote for their preferred candidate even if he is listed on the ballot as another party's candidate. . . .

*Id.* at 362-63 (internal citations omitted).

We reject Appellants' argument that the protections afforded by the Pennsylvania Constitution for speech and associational rights require a different result. Here, Appellants and like-minded members of the Working Families Party were able to meet and decide that the candidate who best represented their values was Rabb. They then had to opportunity to participate fully in the political process, culminating in casting their votes for the candidate of their choice. Under these circumstances, their speech and associational rights were not violated.

Because Appellants have failed to establish that the challenged anti-fusion provisions of the Election Code clearly, palpably and plainly violate the equal protection clause of the United States Constitution or Article I, Sections 5, 7, and 20 of the Pennsylvania Constitution, the order of the Commonwealth Court is affirmed.

Chief Justice Saylor and Justices Baer and Dougherty join the opinion.

Justice Todd files a concurring and dissenting opinion in which Justice Donohue joins.

Justice Wecht files a concurring and dissenting opinion in which Justice Donohue joins.