**[J-96-2020] [MO: Baer, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| PENNSYLVANIA DEMOCRATIC PARTY, NILOFER NINA AHMAD, DANILO BURGOS, AUSTIN DAVIS, DWIGHT EVANS, ISABELLA FITZGERALD, EDWARD GAINEY, MANUEL M. GUZMAN, JR., JORDAN A. HARRIS, ARTHUR HAYWOOD, MALCOLM KENYATTA, PATTY H. KIM, STEPHEN KINSEY, PETER SCHWEYER, SHARIF STREET, AND ANTHONY H. WILLIAMS | : : : : : : : : : : : : : : : : : : : : : | No. 133 MM 2020<br><br>SUBMITTED: September 8, 2020 |
| v. | : : : | |
| KATHY BOOCKVAR, IN HER CAPACITY AS SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; ADAMS COUNTY BOARD OF ELECTIONS; ALLEGHENY COUNTY BOARD OF ELECTIONS; ARMSTRONG COUNTY BOARD OF ELECTIONS; BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD COUNTY BOARD OF ELECTIONS; BERKS COUNTY BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF ELECTIONS; BRADFORD COUNTY BOARD OF ELECTIONS; BUCKS COUNTY BOARD OF ELECTIONS; BUTLER COUNTY BOARD OF ELECTIONS; CAMBRIA COUNTY BOARD OF ELECTIONS; CAMERON COUNTY BOARD OF ELECTIONS; CARBON COUNTY BOARD OF ELECTIONS; CENTRE COUNTY BOARD OF ELECTIONS; CHESTER COUNTY BOARD OF ELECTIONS; CLARION COUNTY BOARD OF ELECTIONS; CLEARFIELD COUNTY BOARD OF ELECTIONS; CLINTON COUNTY BOARD OF ELECTIONS; | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | |

COLUMBIA COUNTY BOARD OF ELECTIONS; CRAWFORD COUNTY BOARD OF ELECTIONS; CUMBERLAND COUNTY BOARD OF ELECTIONS; DAUPHIN COUNTY BOARD OF ELECTIONS; DELAWARE COUNTY BOARD OF ELECTIONS; ELK COUNTY BOARD OF ELECTIONS; ERIE COUNTY BOARD OF ELECTIONS; FAYETTE COUNTY BOARD OF ELECTIONS; FOREST COUNTY BOARD OF ELECTIONS; FRANKLIN COUNTY BOARD OF ELECTIONS; FULTON COUNTY BOARD OF ELECTIONS; GREENE COUNTY BOARD OF ELECTIONS; HUNTINGDON COUNTY BOARD OF ELECTIONS; INDIANA COUNTY BOARD OF ELECTIONS; JEFFERSON COUNTY BOARD OF ELECTIONS; JUNIATA COUNTY BOARD OF ELECTIONS; LACKAWANNA COUNTY BOARD OF ELECTIONS; LANCASTER COUNTY BOARD OF ELECTIONS; LAWRENCE COUNTY BOARD OF ELECTIONS; LEBANON COUNTY BOARD OF ELECTIONS; LEHIGH COUNTY BOARD OF ELECTIONS; LUZERNE COUNTY BOARD OF ELECTIONS; LYCOMING COUNTY BOARD OF ELECTIONS; MCKEAN COUNTY BOARD OF ELECTIONS; MERCER COUNTY BOARD OF ELECTIONS; MIFFLIN COUNTY BOARD OF ELECTIONS; MONROE COUNTY BOARD OF ELECTIONS; MONTGOMERY COUNTY BOARD OF ELECTIONS; MONTOUR COUNTY BOARD OF ELECTIONS; NORTHAMPTON COUNTY BOARD OF ELECTIONS; NORTHUMBERLAND COUNTY BOARD OF ELECTIONS; PERRY COUNTY BOARD OF ELECTIONS; PHILADELPHIA COUNTY BOARD OF ELECTIONS; PIKE COUNTY BOARD OF ELECTIONS; POTTER COUNTY BOARD OF ELECTIONS; SCHUYLKILL COUNTY BOARD OF ELECTIONS; SNYDER COUNTY BOARD

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

OF ELECTIONS; SOMERSET COUNTY :
BOARD OF ELECTIONS; SULLIVAN :
COUNTY BOARD OF ELECTIONS; :
SUSQUEHANNA COUNTY BOARD OF :
ELECTIONS; TIOGA COUNTY BOARD OF :
ELECTIONS; UNION COUNTY BOARD OF :
ELECTIONS; VENANGO COUNTY BOARD :
OF ELECTIONS; WARREN COUNTY :
BOARD OF ELECTIONS; WASHINGTON :
COUNTY BOARD OF ELECTIONS; :
WAYNE COUNTY BOARD OF :
ELECTIONS; WESTMORELAND COUNTY :
BOARD OF ELECTIONS; WYOMING :
COUNTY BOARD OF ELECTIONS; AND :
YORK COUNTY BOARD OF ELECTIONS :
:
:
PETITION OF: KATHY BOOCKVAR, IN :
HER CAPACITY AS SECRETARY OF THE :
COMMONWEALTH OF PENNSYLVANIA :

**CONCURRING OPINION**

**JUSTICE WECHT**                                **DECIDED: September 17, 2020**

I join the learned Majority's Opinion in full. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."[1] As the Supreme Court of the United States has explained, the right to vote comprises not just "the right of qualified voters within a state

---

[1] *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

to cast their ballots," but also the right "to have their ballots counted."[2]  In our Commonwealth, the franchise is guaranteed by the Free and Equal Elections Clause of the Pennsylvania Constitution, which commands: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."[3]  The history of that clause, which predates the United States Constitution and has no federal counterpart, evinces the intent of its framers that it be given "the broadest interpretation, one which governs all aspects of the electoral process."[4]

Expounding upon the contours of the guarantee of free and equal suffrage contained within the Constitution of Kentucky, which was modeled on our own organic charter, the Kentucky Supreme Court observed that, "when any substantial number of legal voters are, from any cause, denied the right to vote, the election is not free and equal, in the meaning of the Constitution."[5]

> [T]his constitutional provision admits of no evasions or exceptions.  No amount of good intention or good faith can be allowed to defeat its purpose or its meaning.  When the question arises, the single inquiry will be:  Was the election free and equal, in the sense that no substantial number of persons entitled to vote and who offered to vote were denied the privilege?[6]

---

[2]  *United States v. Classic*, 313 U.S. 299, 314, 315 (1941); *accord United States v. Mosley*, 238 U.S. 383, 386 (1915).

[3]  PA. CONST. art. I, § V.

[4]  *League of Women Voters of Pa. v. Pa.*, 178 A.3d 737, 809 (Pa. 2018); *see Winston v. Moore*, 91 A. 520, 523 (Pa. 1914).

[5]  *Wallbrecht v. Ingram*, 175 S.W. 1022, 1026 (Ky. 1915).

[6]  *Id.* at 1027.

Although the conditions that might infringe the franchise are too manifold to enumerate, when we are satisfied that a violation of the right has occurred or is likely to occur, "our Court possesses broad authority to craft meaningful remedies when required."[7]

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."[8]  To that end, we recognized in *League of Women Voters* that "[a] broad and robust interpretation" of the Free and Equal Elections Clause could restore the public's confidence in the redistricting process by "guard[ing] against the risk of unfairly rendering votes nugatory."[9]  The same easily could be said of an election scheduled in the wake—or midst—of a natural disaster, civil unrest, or other emergency, where systemic disruptions in basic government services like mail delivery—upon which the machinery of our election system relies more than ever with the advent of broad mail-in voting—can be demonstrated or reasonably anticipated.[10]  Indeed, the "adverse consequences" occasioned by a dysfunctional electoral process that threatens to disenfranchise a broad swath of the electorate are no less pernicious than those of partisan gerrymandering.  Left unabated, each threatens to "discourag[e] voters from

---

[7]     *League of Women Voters*, 178 A.3d at 822 (citing PA. CONST. art. V, §§ 1, 2, 10); *see Reynolds v. Sims,* 377 U.S. 533, 566 (1964) ("[A] denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.").

[8]     *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*).

[9]     *League of Women Voters*, 178 A.3d at 814.

[10]    *See In re General Election-1985*, 531 A.2d 836, 839 (Pa. Cmwlth. 1987) ("To permit an election to be conducted where members of the electorate could be deprived of their opportunity to participate because of circumstances beyond their control . . . would be inconsistent with the purpose of the election laws.").

participating in the electoral process because they have come to believe" that their vote will not count through no fault of their own.[11]

In determining whether present systemic disruptions in government services are well-documented in this Commonwealth, we need look no further than the recent Congressional testimony of Postmaster General Louis DeJoy. Appearing before committees of the United States House and Senate, DeJoy acknowledged that "[a] substantial portion of [mail] delays are related to COVID."[12] Highlighting the acute effects of the pandemic on mail delays within Pennsylvania, DeJoy explained:

> As the coronavirus cases throughout the country have expanded it has had an impact on our employee availability. And in the urban areas that are hotspots—the averages don't play out what the real picture is like in areas like Philadelphia, where employee availability is significantly below normal run rates.[13]

Lacking any materially contradictory evidence, we have no reason to doubt the accuracy of DeJoy's testimony on these points. While the Postal Service may be able to prioritize election mail to mitigate these concerns, they cannot alter the laws of time and space.

The extraordinary circumstances under which this year's quadrennial presidential election must be contested manifestly justify an equitable remedy modifying the received-

---

[11] *League of Women Voters*, 178 A.3d at 814; *cf. Working Families Party v. Commonwealth*, 209 A.3d 270, 306-07 (Pa. 2019) (Wecht, J., concurring and dissenting) ("The Free and Equal Elections Clause is compromised where the regulatory approach adopted by the legislature has the well-documented effect of . . . depressing voter enthusiasm and participation.").

[12] Examining the Finances and Operations of the United States Postal Service During COVID-19 and Upcoming Elections: Hearing Before the S. Homeland Security Comm., 116th Cong. (Aug. 21, 2020).

[13] Protecting the Timely Delivery of Mail, Medicine, and Mail-in Ballots: Hearing Before the H. Oversight & Gov't Reform Comm., 116th Cong. (Aug. 24, 2020).

by deadline for absentee and mail-in ballots to account for these exigencies and to ensure that no unnecessary impediments to each citizen's exercise of the franchise be interposed that reasonably can be avoided. Having determined that the convergence of a once-in-a-century pandemic and unprecedented operational delays in United States Postal Service delivery capacity threatens to undermine the integrity of our general election, this *force majeure* necessitates relief.

I endorse the Majority's narrowly-tailored remedy, which extends the received-by deadline by just three days to compensate for projected mail-delivery delays of similar duration. Extrapolating from the Department of State's primary election data, that timeframe should capture the vast majority of late-arriving ballots that were deposited with the Postal Service on or in the few days before Election Day. That approach also will minimize the number of voters denied the franchise simply for mailing their votes based upon long-trusted, but presently unrealistic expectations about the speed of the post, while minimizing any subsequent delay in the tallying of votes and avoiding any material disruption to the sequence of events that follow in the weeks following a national election.

While I join the Majority's resolution of Count III, I do so subject to the belief that it is limited to the particular concerns litigated and the lack of any proposal regarding a practicable manner of relieving the problem alleged. In my view, today's ruling should be understood to extend no farther than to ballot defects that are capable of objective assessment pursuant to uniform standards[14]—a qualification that captures all of the defects Petitioners seek the opportunity to cure in this case.

---

[14] *See* PA. CONST. art. VII, § 6 ("All laws regulating the holding of elections by the citizens . . . shall be uniform throughout the State."); *Kuznik v. Westmoreland Cty. Bd. of*

For example, the failure to "fill out, date and sign the declaration printed on" the ballot return envelope, as required by 25 P.S. § 3150.16(a), is a deficiency that can be readily observed. Absent some proof that the enforcement of such a uniform, neutrally applicable election regulation will result in a constitutionally intolerable ratio of rejected ballots, I detect no offense to the Free and Equal Elections Clause. Moreover, Petitioners propose only an amorphous standard that would permit electors to cure "minor" defects and omissions; they supply no judicially manageable criteria for distinguishing "minor" defects from "major" ones that could be adopted on a statewide basis, nor do they propose a process to facilitate the opportunity to cure that they seek that can be implemented and fairly administered in every voting district in the Commonwealth in the weeks between now and the general election. So long as the Secretary and the county boards of elections provide electors with adequate instructions for completing the declaration of the elector—including conspicuous warnings regarding the consequences for failing strictly to adhere—pre-deprivation notice is unnecessary.

But I view these issues as distinct from circumstances in which a ballot's validity turns on subjective assessments, such as signature mismatches assessed by poll workers with no training or expertise in matching signatures. The enforcement of such requirements presents risks of inconsistency and arbitrariness that may implicate constitutional guarantees not raised in this case, including due process and equal protection principles. Signature comparison is a process fraught with the risk of error and

_____

*Comm'rs*, 902 A.2d 476, 490 (Pa. 2006) ("We have held that 'to be uniform in the constitutional sense . . . a law [regulating the holding of elections] must treat all persons in the same circumstances alike.'") (quoting *Kerns v. Kane*, 69 A.2d 383, 393 (Pa. 1949)).

inconsistent application, especially when conducted by lay people.[15]  While this case

offers no challenge to such inherently subjective bases for disqualifying ballots, I do not

view today's Opinion as foreclosing the possibility of relief in a future case seeking the

opportunity to address circumstances in which a subjective, lay assessment of voter

requirements as to which reasonable minds might differ stands between the elector and

the tabulating machine.

We would not write on a blank slate in this regard.  These concerns have been

recognized by numerous tribunals in recent years, and various courts have granted relief

on similar grounds, including three federal courts in the last few weeks alone.[16]  Those

_____

[15]     *Cf. United States v. Starzecpyzel*, 880 F.Supp. 1027, 1046 (S.D.N.Y. 1995) (noting the risk of "natural variations" in handwriting and citing factors such as "disease, intoxication and the passage of time," and citing a putative handwriting expert as observing that "[s]ome people have a lot of individuality present in their writing and other people do not").

[16]     *See, e.g.*, *Ariz. Dem. Party v. Hobbs*, CV-20-01143-PHX-DLR (D. Ariz. Sept. 10, 2020); *Richardson v. Tex. Sec. of State*, SA-19-cv-00963-OLG (W.D. Tex. Sept. 8, 2020); *Frederick v. Lawson*, 1:19-cv-01959-SEB-MDJ, ___ F. Supp. 3d ___, 2020 WL 4882696 (S.D. Ind. Aug. 20, 2020); *see also League of Un. Latin Am. Citizens of Iowa v. Pate*, Polk Cty. CVCV056403, 2018 WL 3946147, at *1 (Iowa Aug. 10, 2018) (enjoining use of signature-matching provisions in Iowa's Election Code); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (enjoining enforcement of Georgia statute permitting rejection of absentee ballots and ballot applications due to alleged signature mismatch), *emergency motion for stay of injunction pending appeal denied*, *Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D. N.H. 2018) (holding that New Hampshire's signature-match requirement for absentee ballots was facially unconstitutional under the Fourteenth Amendment); *Florida Dem. Party v. Detzner*, 4:16cv607-MW/CAS, 2016 WL 6090943, at *9 (N.D. Fla. Oct. 16, 2016) (striking down Florida's mail-in ballot signature match law as violative of the Fourteenth Amendment); *Zessar v. Helander*, 05 C 1917, 2006 WL 642646, at *10 (N.D. Ill. 2006) (finding that the Illinois Election Code provisions requiring signature comparisons on absentee ballots violated voters' due process rights); *La Follette v. Padilla*, CPF-17-515931, 2018 WL 3953766, at *3 (Cal. Super. Ct. Mar. 5, 2018) (holding that California Election Code ballot signature-mismatch provision facially violates due process); *cf.* Susie Armitage, *Handwriting Disputes Cause Headaches for Some Absentee Voters*, ProPublica    (Nov. 5, 2018),    www.propublica.org/article/handwriting-disputes-cause-

courts have found that the administrative burden of a notice-and-cure remedy is outweighed by the threat to the fundamental rights of voters whose ballots otherwise would not be counted.

While one might hope that the General Assembly would revisit the issue and consider furnishing such a procedure on its own initiative, this Court has the prerogative to address this problem if it proves worthy upon closer examination. As a "state court with the power to assure uniformity," we have the authority, and indeed the obligation, to direct the canvassing of absentee and mail-in ballots in a manner that satisfies "the rudimentary requirements of equal treatment and fundamental fairness" when we find a palpable failure to meet those constitutional thresholds.[17] Regardless, Petitioners do not bring a discrete challenge to the Commonwealth's prescribed processes for examining the validity of signatures on ballot envelopes, so resolution of that question must wait.[18]

Turning finally to Count IV, I agree wholeheartedly with the Majority's analysis. I write separately to underscore that this case illustrates most consequentially the potential for mischief, albeit well-meaning, when we are called upon to question the "true" meaning of the General Assembly's contextually ambiguous use of the word "shall." In my view,

---

headaches-for-some-absentee-voters (discussing legal challenges to signature-match laws).

[17] *Bush v. Gore*, 531 U.S. 98, 109 (2000) (*per curiam*).

[18] During the pendency of this appeal, Secretary Boockvar issued a guidance document that, in furtherance of "consistency across the 67 counties," instructs election officials that "[t]he Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." Guidance Concerning Examination of Absentee and Mail-In Ballot Return Envelopes at 3 (Sept. 11, 2020) www.dos.pa.gov/ VotingElections/OtherServicesEvents/Documents/Examination%20of%20Absentee%20 and%20Mail-In%20Ballot%20Return%20Envelopes.pdf.

there are times when this Court has done so gratuitously. But far more frequently, this unfortunate circumstance is foisted upon us by the choices made by the General Assembly during the often tortuous drafting process,

The difficulty inherent in that enterprise, and concomitantly the risk that we will misconstrue legislative intent, is clear. In searching for methods to remove the guesswork from such situations, Pennsylvania courts have labored mightily but in vain to fashion a coherent organizing principle for determining when the legislature meant "you may" when it said "you must."

For example, the Superior Court once suggested that the distinction inheres in "the *effect* of non-compliance . . . . A provision is mandatory when failure to follow it renders the proceedings to which it relates illegal and void; it is directory when the failure to follow it does not invalidate the proceedings."[19] But where the court considers the consequences of a failure to perform a task stated in mandatory language, this distinction is nonsensical: we cannot gauge the effect of non-compliance simply by asking what the effect of non-compliance is. In *Bell v. Powell*, we proposed an equally confounding alternative:

> [Shall] may be construed to mean 'may' when no right or benefit to any one depends on its imperative use, when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to any individual, by giving it that construction, or when it is absolutely necessary to prevent irreparable mischief, or to construe a direction so that it shall not interfere with vested rights, or conflict with the proper exercise of power by either of the fundamental branches of government . . . .[20]

---

[19] *Borough of Pleasant Hills v. Carroll*, 125 A.2d 466, 469 (Pa. Super. 1956) (*en banc*) (emphasis in original).

[20] *Commonwealth ex rel. Bell v. Powell*, 94 A. 746, 748 (Pa. 1915) (cleaned up).

This impenetrable passage suggests nothing to me so much as that we are free to do whatever we want only when what we do does not matter.

To be sure, there may be value in legislating in both mandatory and directory terms. But no benefit is served by, nor is there any excuse for, rendering the distinction opaque with critical omissions, such as the failure to specify a specific consequence for failing to adhere to a particular mandate—especially where, as in the case of naked ballots, the legislature did so for closely related, if not constructively identical, correlative statutory provisions. The General Assembly must endeavor always to distinguish between what it intends to be mandatory and what directory, in its words or by clear and necessary inference. When it fails to do so, courts are left to bend unclear texts toward whatever ends that they believe to be consonant with legislative intent, but with little or no contemporaneous insight into whether they have done so successfully. When the General Assembly does not choose its words carefully according to their intended effect, it leaves courts with no choice but to sharpen what the drafters made dull.

For this Court's part, if we are to maintain a principled approach to statutory interpretation that comports with the mandate of our Statutory Construction Act, if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all. If the result, at times, is that the Court imposes a more doctrinaire result than the legislature intended, that body has the tools at its disposal to ensure that the same mistake does not recur.